## Kendall, Appellant, *v.* Klapperthal Company.

*Corporations—Directors—Reimbursement of directors for moneys advanced to corporation.*

If directors of a corporation supply the latter with money to meet its legitimate needs, and the money so furnished is properly used in carrying on the corporate business, they are entitled to recover from the company the value of the money so supplied and used, and not upon the basis of any actual contract, but of a duty which the law imposes, for reasons of justice to make fair compensation for what has been properly received and applied. This rule applies where the same persons associate themselves together under different corporate names and organizations for the purpose of carrying out several branches of a single common enterprise and advances are made by directors to one corporation, and are reimbursed to them by another of the corporations; and this is especially so where the reimbursement is actually authorized at a stockholders' meeting of the company reimbursing.

Argued March 3, 1902. Appeal, No. 96, Jan. T., 1901, by

plaintiff, from decree of C. P. Berks Co., Equity Docket 1900, No. 762, dismissing bill in equity in case of Henry T. Kendall, v. Klapperthal Company and George Brooke, George F. Baer, William D. Smith, Richard T. Leaf and Heber Y. Yost. Before McCollum, C. J., Dean, Fell, Mestrezat and Potter, JJ. Affirmed.

Bill in equity for a receiver and an injunction.

The case was tried before Endlich, J., who filed the following opinion:

The bill filed in this case on March 6, 1900, by plaintiff as a stockholder in the Klapperthal Company, alleges a misappropriation by certain of the defendants for their own benefit of valuable assets belonging to said company, and a combination between all the defendants to cause the remainder of the property of the concern to be sold out under judicial process for the purpose of destroying the value of plaintiff's stockholdings in the same, and prays for an injunction against the threatened execution, appointment of a receiver, etc. The answer, filed March 13, 1900, denies all illegality in, and avers matters in explanation of, the transactions attacked as fraudulent. In due course, the cause was tried and argued. Upon the basis of the admissions in the pleadings and of the testimony taken, I make the following findings of fact:

1. Early in 1884, the plaintiff, his brother Jos. V. Kendall, Richard T Leaf, Christopher Leoser (now deceased, who on January 15, 1886, conveyed one half of his interest to William McIlvain, now also deceased), Abraham F. Reeser (who on July 1, 1884, conveyed his interest to Geo. F. Baer), and Bentley H. Smith (who on January 6, 1885, conveyed his interest to his brother William D. Smith), purchased a tract of land of about 100 acres close to the city of Reading, with a view to developing and improving the same by the construction of roads, laying it out in building lots and reselling these, and for the same purpose acquired interests and title in other contiguous lands, adding to their holdings in 1888 a tract known as the Romig farm in consideration of a transfer to its owner, George Brooke, of an interest in the entire property, the several interests therein of the parties being then fixed by agreement as

follows : George Brooke three shares, Henry T. Kendall, (plaintiff) two shares, Jos. V. Kendall two shares, Geo. F. Baer two shares, William D. Smith two shares, Richard T. Leaf two shares, Christopher Leoser one share, and William McIlvain one share.

2. On August 12, 1889, the Klapperthal Company was incorporated, with a capital stock of $60,000 divided into 1,200 shares of the par value of $50.00 per share, held by the parties named in the concluding portion of Findings, No. 1, in the proportion there indicated, viz : 240 shares by George Brooke, 160 shares each by plaintiff, Jos. T. Kendall (whose rights were subsequently acquired by plaintiff), Geo. F. Baer, Wm. D. Smith and Richard T. Leaf, and eighty shares each by Christopher Leoser and William McIlvain. The purposes of the incorporation were those of the original land association.

3. In the meanwhile, in the pursuit of the purpose to develop the property and bring it into the market as a suburban territory, it had been suggested on behalf of the projectors of the Klapperthal Company to the Philadelphia and Reading Railroad Company, that the former give to the latter ground for the erection of a station and prepare a picnic ground for excursionists on the south side of the Neversink mountain at what is known as the " Big Dam," and that the said Philadelphia & Reading Railroad Company there erect a station and allow the Klapperthal Company the use of the waste water of said dam for the purpose of obtaining power, which suggestion the Philadelphia & Reading Railroad Company had signified its willingness to adopt on condition that the Klapperthal Company build or secure to be built a railway connecting said " Big Dam " and the picnic ground contemplated, with the city of Reading over the Neversink mountain ; and this condition was in turn agreed to by the Klapperthal Company.

4. With a view to carrying out the arrangement described in Findings, No. 3, the Neversink Mountain Railroad Company was organized by practically the same persons who were concerned in the Klapperthal Company and for its advancement ; and with the same object, as well as in order to secure possible future advantages from the existence and control of a corporation empowered to furnish power and light by electricity not only for the operation of the railroad contemplated but

also to other parties, the Neversink Light, Heat & Power Company was subsequently organized by substantially the same parties; and still with the same purpose in view, to wit: the development of the land held by the Klapperthal Company, the organization of the companies mentioned was followed by that of the Neversink Mountain Hotel Company,—all of these concerns being duly incorporated with the powers and franchises accorded to the classes of corporations to which they respectively belong.

5. The electric plant at the " Big Dam " was erected in the latter part of 1889 by the Klapperthal Company after having made, in conjunction with the Neversink Mountain Railroad Company, a written agreement, dated August 15, 1889, with the Philadelphia & Reading Railroad Company, for a period of ninety-nine years, leasing to it a sufficient quantity of land and permitting it to use for the purpose of obtaining power the surplus water in said dam; such use, however, not to interfere with the Philadelphia & Reading Railroad Company's use of the canal or with slack water navigation, and the Philadelphia & Reading Railroad Company to be under no obligation to keep up or maintain said dam when no longer required by it, but the Klapperthal Company in that event to have the right to do so; and further, said company to convey in fee to the Philadelphia & Reading Railroad Company as much land as should be required by it for a proper station, tracks and yards; to set apart and improve suitable picnic grounds, etc.; to light the Philadelphia & Reading Railroad Company's station, free of charge with electricity, and to furnish electric motive power to the Neversink Mountain Railroad Company at reasonable rates, the latter company to construct a railroad up, over and around the Neversink mountain to the city of Reading, of the same gauge and connected with the Philadelphia & Reading Company's tracks. For the purpose of meeting the cost of the erection of the electric plant, the Klapperthal Company borrowed $28,000 upon its notes indorsed by George Brooke, William D. Smith, Geo. F. Baer, Richard T. Leaf and Morton C. McIlvain, who by common consent represented the interests and acted in the places of Christopher Leoser from the time when he became incapacitated and William McIlvain from the

time of his death, which notes were subsequently taken up by the indorsers, defendants.

6. Upon its notes similarly indorsed, the Klapperthal Company also raised $3,000 to take that amount of stock in the Neversink Mountain Hotel Company, which notes were subsequently taken up by the indorsers, defendants.

7. When the construction of the Neversink Mountain Railroad was under way, it was found impossible to sell to the public sufficient of its stock, or, thereafter, of the bonds secured by mortgage upon it, to pay for its completion, nor were its receipts thereafter from this source, together with its earnings, sufficient to meet its ordinary expenses.   In this emergency, George Brooke, William D. Smith, George F. Baer, Richard T. Leaf and Morton C. McIlvain agreed to become indorsers of the company's notes for the purpose of raising the money that would be needed from time to time, the understanding common to all parties being that the loan of their credit was made for the carrying out of the projects of the Klapperthal Company; that whoever indorsed should bear his proportionate share of the total liability whatever it should sum up to, without regard to the individual indorsements of each one, and that the indorsers should be protected; and as expressive of that understanding, a stockholders' meeting of the Klapperthal Company, at which the plaintiff was present, on November 21, 1891, without dissent adopted and put upon its minutes a resolution declaring that the notes of the Neversink Mountain Railroad Company, and the indorsements thereof by the parties above named, were made for the benefit of the Klapperthal Company, and that the latter, in consideration of the continuance of said indorsements, " do hereby agree to guarantee the payment of said notes, and to indemnify and save harmless the said indorsers from all liability by reason of said indorsements."

8. On June 11, 1892, the Klapperthal Company executed a formal transfer of the electric plant at the " Big Dam," with its rights, etc., under the agreement of August 15, 1889 (see Findings, No. 5), to the Neversink Light, Heat & Power Company in consideration of $50,000, payment of which was to be and was made and accepted in the shape of a transfer to the Klapperthal Company by the Neversink Light, Heat & Power

Company of the whole 500 shares of its capital stock ($50,000 divided into shares of $100 each). Of these 500 shares, however, 240 were about the same time transferred by the Klapperthal Company to the Neversink Mountain Railroad Company in exchange for 480 shares of the latter's stock transferred by it to the Klapperthal Company.

9. The Neversink Mountain Railroad Company having placed a mortgage upon its property securing bonds of $1,000 each to the amount of $100,000, succeeded in selling fifteen and in placing as collateral for notes executed by and discounted for it thirty-six more, prior to June 18, 1892, at which date the indorsements made for its benefit by the parties named in Findings, No. 7, amounted to $101,500, all of which was applied to the legitimate purposes of its incorporation. In order to secure the indorsers, a resolution was on that day adopted by the directors of said company directing the deposit with the Pennsylvania Trust Company, the holder of the notes thus indorsed, in order to secure payment of them and in relief of the indorsers, of (*a*) the forty-nine remaining first mortgage bonds (the resolution erroneously speaking of sixty-nine, but the number actually available and deposited in pursuance of the resolution being forty-nine) which the trust company was to sell, and also (*b*) 240 shares of the stock of the Neversink Light, Heat & Power Company held by the Neversink Mountain Railroad Company (see Finding, No. 8). Of the forty-nine bonds four were subsequently pledged to the trust company as additional collateral, one was handed over to plaintiff as security for his collateral indorsement of a $500 note of the Neversink Mountain Railroad Company, and one was passed over to a contractor for work done by him for the company. The trust company being unwilling to carry the notes any longer, without reduction; the amount of the indebtedness upon new indorsements by the same parties having been increased in order to meet the expenses of the road by $11,000; additional notes for the same purpose, not indorsed by said parties, of $2,000 having been also discounted, and there being a large amount of interest in arrears, the forty-three remaining bonds were taken by the indorsers at par, which was more than double their value then and at any time since, and so paid for by them, the proceeds being turned over to the

Neversink Mountain Railroad Company, and applied by it under resolution of November 15, 1893, as follows : $25,500 on notes of the company issued before November 1, 1891, and indorsed by said parties ; $8,500 on notes of the company issued after November 1, 1891, and so indorsed ; $7,000 for interest accrued ; $2,000 on notes not indorsed by said parties. Said indorsers also subsequently, in pursuance of a general understanding, took the 240 shares of the Neversink Light, Heat & Power Company's stock off the hands of its pledgee, at $200 per share, the $48,000 thus paid in by them being employed in taking up further notes of the Neversink Mountain Railroad Company, originating before November 1, 1891, and indorsed by them (see Finding, No. 12). In this way the indebtedness of said company was reduced by $91,000. The balance of it, for which the indorsers were liable, was paid by them out of their pockets, they receiving the notes from the trust company, and holding the forty-three bonds as an equivalent for the $25,500 of notes paid out of the proceeds by their purchase of said bonds.

10. On March 30, 1895, the Neversink Light, Heat & Power Company executed a lease (to run to August 4, 1998) of its plant, etc., to the Metropolitan Electric Company, reserving a rental of $6,650 for the first year, $7,600 for the second, $8,500 for the third, and $9,500 for the fourth and each succeeding year the reorganization of the Philadelphia & Reading Railroad Company after foreclosure having consented to affirm and continue the agreement of August 15, 1889 (see Finding, No. 5) ; since which arrangement and up to the date of the filing of this bill said Neversink Light, Heat & Power Company has been enabled to declare and pay the following dividends : 1897, $11.00 per share ; 1898, $12.00 per share; 1899, $12.00 per share ; 1900, $12.00 per share.

11. On January 10, 1896, the directors of the Klapperthal Company at a regular meeting of the board unanimously passed a resolution, which, after reciting the resolution of the company of November 21, 1891 (see Finding, No. 7), and the fact that the indorsers of the Neversink Mountain Railroad Company's notes were still liable for a large sum by reason of their indorsements, directed that, in order to carry out the spirit and object of the guaranty evidenced by the resolution of Novem-

ber 21, 1891, the Klapperthal Company purchase the notes of the Neversink Mountain Railroad Company from the indorsers, paying therefor in stock of the Neversink Light, Heat & Power Company owned by the Klapperthal Company at the rate of $200 per share. Of this action the plaintiff had notice in advance, when it was discussed and explained among the parties interested, and from it, as a proposition, he did not dissent. The purpose of it, as understood and recognized as equitable on all hands, was to reimburse the indorsers for the loss incurred by them by reason of their indorsements, which, having been made and continued in the pursuit of the original projects of the Klapperthal Company and supposedly for its ultimate advantage, that company justly stood to make good.

12. In pursuance of the resolution of January 10, 1896, and in accord with the original agreement of the indorsers' interest (see Finding, No. 7), a scheme of partial distribution among them of shares of the Neversink Light, Heat & Power Company was prepared and agreed to on August 1, 1896. Going back to the purchase of the 240 shares pledged to the Pennsylvania Trust Company (see Finding, No. 9), these shares, as well as those presently held by the Klapperthal Company, were treated as available for distribution on the basis and in the proportion of the contributions made by the several indorsers. It was ascertained that the amount of notes antedating November 1, 1891, paid out of the proceeds of that purchase was $46,894.57 (approximating most closely the value of 235 shares at $200 per share); that the amount of later notes paid by the indorsers was $11,000; that the advances made by them for discounts, etc., was $9,278.02; and that the addition of interest from the dates of such payments to August 1, 1896, swelled the total of their outlay in these particulars to $67,172.59. The indorsers were then charged with $48,000, the value of $200 per share of the 240 taken by them, and these were distributed among them in the proportion in which they furnished said $48,000. Deducting this sum from the total of $67,172.59, there remained a balance representing new notes, discounts and interest, of $19,172.59, the equivalent of something more than ninety-five shares at $200 per share. Accordingly, ninety-five shares of the Neversink Light, Heat & Power Company were taken out of the holdings of the Klapperthal Company and dis-

tributed to the indorsers in the proportion in which they had contributed to the payment of the items represented by said balance, and in liquidation of the same. Thus, under the distribution of August 1, 1896, the indorsers became the holders of Neversink Light, Heat & Power Company stock as follows : George Brooke, eighty shares; Geo. F. Baer, eighty-eight; Wm. D. Smith, sixty-eight; Richard T. Leaf, thirty-one, and Morton C. McIlvain, sixty-eight, and there remained in the hands of the Klapperthal Company, 165. There also remained due to the indorsers, the balance of the notes antedating November 21, 1891, not paid out of the proceeds of their purchase of the forty-three Neversink Mountain Railroad bonds, but out of their pockets (see Finding, No. 9).

13. On June 12, 1897, the Klapperthal Company directed the transfer of twelve of its shares of the Neversink Light, Heat & Power Company in payment of the cost of the construction of a pavilion on the Neversink mountain, and of the price of the land on which it was erected—a measure which had previously been determined upon in aid of the Neversink Mountain Railroad Company, and which, there being no funds available for the purpose, had been carried out by the persons to whom these twelve shares were now transferred—ten going to the same persons who participated in the distribution of August 1, 1896, and two to a third party interested in the land occupied by the pavilion and conveyed to the Klapperthal Company. The plaintiff voted for the resolution directing the transfer of said shares, with knowledge of the approximate cost and value of the pavilion, having been one of the persons who had made themselves liable for the expenditure, but refused to pay his proportion. The number of shares remaining in the hands of the Klapperthal Company was thus reduced to 153.

14. On the same day, a resolution was adopted by the directors of the Klapperthal Company authorizing a further distribution of 125 shares of the Neversink Light, Heat & Power Company stock held by it in exchange for the remaining notes of the Neversink Mountain Railroad Company antedating November 21, 1891, but not paid out of the proceeds of the purchase of its bonds ($43,000) and taken up and held by the indorsers without security of any kind (see Finding, No. 9), with the amount advanced by them in the way of

discounts, etc.; the value of said shares being again taken as $200 each; and an option was given to plaintiff to exchange the $500 collateral note he had indorsed for the Neversink Mountain Railroad Company, together with the $1,000 bond of said company held by him as security therefor, for two and one half shares of said stock. Plaintiff did not avail himself of this option, but still holds said note and bond. The distribution to the indorsers was made as directed, according to the sums contributed by each in taking up said notes, paying said discounts, etc., thus leaving twenty-eight shares of said stock in the hands of the Klapperthal Company.

15. The account between the indorsers on the one side and the Klapperthal and the Neversink Mountain Railroad Companies, relative to the indebtedness of the latter, then stood and still stands, in round figures, as follows:

Upon notes originating and indorsed before November 21, 1891, the liability of the indorsers was $101,500, from which would have to be deducted $43,000 (the sum at which they took the bonds), had the whole of that amount been applied in payment of said notes. Out of it, however, there were paid $11,000 of new notes indorsed by them, $2,000 of notes indorsed by the Klapperthal Company, and $7,000 of accrued interest, thus reducing the $101,500 notes by only $25,500, and leaving $79,500 of them still payable by the indorsers. Upon payment of this balance in 1893, their claim in 1896 was swelled by about $12,500 of interest, making it at the date of the first distribution $92,000. Deducting therefrom the value at $200 per share of 240 shares of the Neversink Light, Heat & Power Company belonging to the Neversink Mountain Railroad Company, their claim to reimbursement was reduced to $44,000, which, by the transfer of ninety-five more of said shares at the same rate belonging to the Klapperthal Company, was brought down to $25,000, and was wiped out by the transfer and acceptance of 125 further shares from the Klapperthal Company as its equivalent. For the $25,000 of notes paid out of the proceeds of the bonds taken up by said indorsers at par, they hold said bonds (see Findings, Nos. 9 and 18).

16. From the beginning of the above transactions, the indorsers together with plaintiff were the chief officers and di-

rectors of the Klapperthal Company, the Neversink Mountain Railroad Company and the Neversink Light, Heat & Power Company, the plaintiff resigning his office of treasurer of the Klapperthal Company about June 12, 1897.

17. About June 12, 1897, the plaintiff began protesting against the reimbursement of the indorsers by the Klapperthal Company for the losses sustained by them in connection with the Neversink Mountain Railroad Company, as well as the payment of the pavilion; declaring that these acts involved a misappropriation of the assets of the former company in which he was and is a stockholder, and that the methods pursued were stripping it of its most valuable possession, the stock of the Neversink Light, Heat & Power Company, and thus operating to his individual injury. A proposition was made to him on behalf of the indorsers to buy his stock in the Klapperthal Company for $6,000, about half its par value, which was understood to be sufficient substantially to reimburse him for all he had paid in, including his original investment in the land association (see Findings, Nos. 1 and 2). The offer was, however, rejected by him. On his motion, a committee was appointed to investigate his complaints, but no action was ever taken by it.

18. The actual value of the Neversink Light, Heat & Power Company's stock has at no time been equal to $200 per share, being more nearly $175 per share; and the value of the Neversink Mountain Railroad Company's bonds is less than fifty per cent of their face value.

19. The Klapperthal Company still owes the defendants Brooke, Smith, Baer and Leaf the sums laid out by them in the taking up of its notes (see Findings, Nos. 5 and 6). The property of the company, apart from its holdings of Neversink Light, Heat & Power Company stock, has for years past been practically valueless. There being no prospect of obtaining payment of the amount owing to them in any other way, the said defendants determined to reduce their claims to judgment, and in order to save costs transferred them to the defendant, Heber Y. Yost, for the purposes of suit. Such suit was brought by him to No. 65, February term, 1900, and the company making no defense, judgment has been entered in favor of plaintiff against said company for $33,078.89.

### DISCUSSION.

It would be a work of supererogation to attempt to justify any of the foregoing findings by a detailed discussion of the evidence, which is quite too plain to admit of a reasonable doubt as to any of them. Nor is there any serious difficulty about the legal and equitable principles applicable to the facts as found.

Whether (ignoring for the present the action of the stockholders in ratification of that of the directors) the contracts made and the acts done by the defendants as directors of the Klapperthal Company looking towards their own reimbursement be regarded as absolutely binding in law upon said company or not, the rule is that if directors of a corporation supply the latter with money to meet its legitimate needs, and the money so furnished is properly used in carrying on the corporate business, they are entitled to recover from the company the value of the money so supplied and used, not upon the basis of any actual contract, but of a duty which the law imposes, for reasons of justice, to make fair compensation for what has been properly received and applied : 1 Morawetz, Priv. Corp. sec. 526 ; 3 Thomp. Corp. sec. 4069. In view of the relation subsisting between the Klapperthal Company and the Neversink Mountain Railroad Company, it will not do to say that the outlay for which the former reimbursed the defendants was not furnished to it but to the railroad company. A court of equity does not take a skin-deep view of a situation like that here presented. It looks to the substance of the transaction, not to its mere form or color (Solarte v. Melville, 1 Man. & R. 204, per Lord TENTERDEN), and sees things as ordinary men do : Warner v. Armstrong, 3 M. & K. 45, per Lord BROUGHAM. Of course, a corporation does not lose its legally distinct and separate personality by reason of the ownership of the bulk or the whole of its stock by another (Monongahela Bridge Co. v. Pittsburg, etc., Traction Co., 196 Pa. 25), nor by its joining hands with another in a common enterprise. But it is well understood that for purposes of equity, courts will look behind that artificial personality, and if need be, ignore it altogether and deal with the individuals who constitute the corporation (Rice's App., 79 Pa. 168 ; Montgomery Web Co. v. Dienelt, 133 Pa. 585 ; Penna. Knitting Mills v. Bibb Mfg. Co., 12 Pa. Su-

perior Ct. 346; Gas Co. v. West, 50 Ia. 16); and that is what
in justice and fairness must be done here, where practically the
same persons were associated together for one common purpose
under three or four different names corresponding to the sev-
eral branches of the single common enterprise, and acted to-
gether only formally as distinct organizations each devoted to
the corporate pursuit of its appropriate branch.   Looking at
the situation in this common sense way—the way in which all
these people, including the plaintiff, themselves looked at it
and the way in which any person of ordinary intelligence would
naturally look at it—the contention that these defendants,
after having put their money into the development of one
branch of the joint undertaking at the manifest risk of losing
nearly all, should, when certain assets formally in the hands of
the parent organization having in its immediate charge the pur-
suit of another branch of the same undertaking, have by a
lucky accident acquired some value, not be reimbursed as far
as possible out of such assets simply because of the absence of
strict legal identity between the two organizations, is one which
is wholly barren of real merit in a court of equity.   He who
asks equity must do equity : 1 Pom. Eq. Jur. sec. 385; Deitz-
ler v. Mishler, 37 Pa. 82, 86.   In the case of Sebring v. Joanna
Heights Assn., 2 Pa. Dist. Reps. 629, this court held that where a
director of a corporation was also its creditor and under circum-
stances making him chargeable with constructive fraud and by
proceedings voidable upon that ground got possession of prop-
erty of the corporation, he would not be compelled to surrender
it except upon condition that he be made whole for the amount
honestly owing him.   It is needless to point out how much less
a court of equity would undertake to compel persons in the
situation of these defendants to surrender what they have ob-
tained except upon similar conditions, which of course, it
would be idle to impose because impossible to perform.

But even upon a narrower view—one which would look upon
the whole matter as a matter of positive contract decisive of the
rights of all the parties to it—the plaintiff's claim here is intenable.
The underlying contract, the resolution of November 21, 1891,
was the act of the corporation itself, acting by its stockhold-
ers at a stockholders' meeting,—not that of its directors merely.
The subsequent acts and resolutions were those of the direct-

ors of the respective companies. Courts will, if they can, give to the contracts of parties the exact effect which the parties themselves gave to them and interpret them just as they interpreted them (Connery v. Brooke, 73 Pa. 84; Creveling v. Wood, 95 Pa. 152, 158; Ringrose v. Ringrose, 170 Pa. 593; Wright v. Monongahela Gas Co., 2 Pa. Superior Ct. 219); nor will they "assume to understand the interests of contracting parties better than the parties themselves:" Phillips v. Blatchford, 137 Mass. 510. That the deposit of bonds with the Pennsylvania Trust Company by the Neversink Mountain Railroad Company under the resolution of June 18, 1892, was not for the sole purpose of protecting notes previously discounted, and was not so understood to be, is shown not only by the subsequent application, unopposed by plaintiff at the time, of part of the proceeds of their purchase by the indorsers to other and later indebtedness under the resolution of November 15, 1893, but by the fact that plaintiff himself took and still holds one of them as collateral security for a note of $500 indorsed by him and not in existence at the time of the deposit. It is, to be sure, not at all clear upon what principle a deposit by the Neversink Mountain Railroad Company, on June 18, 1892, of these bonds as security for notes previously negotiated and a subsequent withdrawal by said company of part of their proceeds from that purpose could have relieved the Klapperthal Company of liability pro tanto upon its guaranty given on November 21, 1891. But supposing that it could, it does not lie in plaintiff's mouth to assert that such was the purpose of the deposit or that the Klapperthal Company's guaranty was in any way affected by the subsequent change of purpose. As understood by him as well as his associates at the time, the interests of all concerned were best served by the application of the bonds and their proceeds as it was actually made, and participating in that arrangement, he is estopped from denying that it was a proper one: Mercer Mining & Mfg. Co. v. McKee, 77 Pa. 170, 173. When we come to the distribution of Neversink Light, Heat & Power Company stock in relief of the indorsers, we find that the first distribution, of every feature of which the plaintiff was cognizant in advance, included an equivalent for $11,000 of notes paid by the indorsers which originated subsequently to the resolution of November 21, 1891. Evidently

they did not understand the effect of that resolution to be restricted to liabilities then already incurred, and evidently the plaintiff himself had not yet become conscious of such an understanding of it; for he made no objection to it upon any ground of that sort, nor, indeed, any objection at all when the figure at which the shares were to be taken by the indorsers had been fixed at $200 as he thought it ought to be; all of which goes to show that the real intention of the resolution of November 21, 1891, was to evidence a contract of indemnity between the Klapperthal Company and the indorsers in respect of future as well as past indorsements. And considering the contract, not only in the light of what the parties did under it, but also, as all contracts must be considered, in the light of the surrounding circumstances and the objects manifestly to be accomplished (Callen v. Hilty, 14 Pa. 286, 288; Allison's App., 77 Pa. 221, 236; Richardson v. Clements, 89 Pa. 503, 505; McKeesport Machine Co. v. Ben Franklin Ins. Co., 173 Pa. 53, 57), this intention is established to what amounts to a certainty as nearly as certainty can ever be attained. The railway enterprise was regarded as essential to the development of the Klapperthal Company's property. Its hold upon the " Big Dam " under the agreement with the Philadelphia & Reading Railroad Company depended upon the construction and maintenance of the railway ; and as involved in the continuance of that arrangement, so did the whole future of the electric plant which was then still owned by the Klapperthal Company and has virtually remained its property and become its most valuable asset. The railway, however, was unable to pay not for its construction merely, but for its operation, and the likelihood was that, before it could pay for either, it would require renewed assistance, the means of providing for which were not in sight, neither the stock nor the bonds of the company finding a ready market. In these circumstances, the purpose of the resolution of November 21, 1891, most obviously was, not only to make those who had the ability and had given proof of their willingness to carry the enterprise along safe in respect of what they had already done, but to secure their further aid by guaranteeing them reimbursement for future outlays as well. That was the understanding between the parties, that the meaning and effect of the resolution of November 21, 1891, and that, therefore, the

contract which it evidenced.   From that contract there was no deviation in any part of the distribution of August 1, 1896; whilst the distribution of 125 shares on June 12, 1897, was justified by the very letter of the resolution of November 21, 1891, construed as plaintiff himself now contends it ought to be. The only possible ground on which the distribution of twelve shares, on the same day, in payment of the pavilion can be attacked, is that the value of it to the Klapperthal Company was not equal to $2,400.   Possibly not; but neither were the twelve shares paid for it worth $2,400, and there is nothing to show that the value which the parties who had put their money into the thing was greater than their expenditure, which ordinary good faith and business honor required to be returned to them.   Besides, the plaintiff voted for the measure, with every reason to know what he was about.

It is claimed in plaintiff's behalf that he ought to be treated, not merely as suing for himself, but as representing the rights of the Klapperthal Company against its officers because of acts on their part which were beyond their powers and injurious to the stockholders of the company.   Ordinarily, doubtless, the plaintiff in a bill of this kind is to be so regarded: 3 Pom. Eq. Jur. sec. 1095.   But one of the peculiarities of this case, so far as the evidence goes, is that the persons accused of wrongdoing and alleged to have been unduly benefited, together with the plaintiff, hold all the stock of the Klapperthal Company, and that the former are all on one side, and the plaintiff is alone on the other opposing them.   Hence his suit is simply in his own behalf and for his own benefit, and there can be no good reason for holding inapplicable to it the principles of estoppel, etc., which ordinarily obtain as between parties litigating strictly on their own account.   If, however, it were true that this action is to be looked upon as one by the Klapperthal Company against defendants, it would hardly be in any better case, in view of the virtual identity of all the companies involved.   Says Mr. Justice FIELD, in Pneumatic Gas Co. v. Berry, 113 U. S. 322 :

"A court of equity does not listen with much satisfaction to complaints of a company that transactions were illegal which had its approval, which were essential to its protection, and the benefits of which it has fully received.   Complaints that

its own directors exceeded their authority come with ill grace where the acts complained of alone preserved its existence."

Substantially to the same effect are the decisions in Oil Creek, etc., R. R. Co. v. Penna. Transportation Co., 83 Pa. 160; Wright v. Antwerp Pipe Line Co., 101 Pa. 204; Boyd v. Am. Carbon Black Co., 182 Pa. 206. Nor is there any inconsistency between these cases and the decision in Culver v. Reno Real Est. Co., 91 Pa. 367. On the contrary, remembering that the resolution of November 21, 1891, the contract of guaranty, was the action of the stockholders of the Klapperthal Company, that decision makes in favor of the defendants here and not of the plaintiff. It must certainly be conceded that the conscience of a chancellor cannot be strongly moved to declare unfaithful to their trust or unduly grasping a set of directors, who, for the sake of keeping alive the common enterprises engaged in by them and their associates, put into those enterprises of their own money sums aggregating with interest upwards of $160,000, risking at the time, and for years thereafter facing the probability of, the loss of at least two thirds of it, and who eventually, upon the fortunate appreciation of one of the properties, have made themselves repaid out of it to the actual amount of about $82,000, accepting that value together with securities worth perhaps $21,000 more, in full satisfaction of nearly or more than $128,000 of their outlay, and who are now seeking to recover as much as they can of the balance of about $33,000 advanced by them and confessedly applied for the benefit of the company they are suing, and that, with the practical certainty that if compelled to return any of the property applied to their reimbursement, their losses will be increased to just that extent. See Froment v. Lessig, 174 Pa. 487. Such, in brief, has been the conduct and is the situation of these defendants. Surely, the facts developed in this case disclose no equity in plaintiff beyond that which defendants themselves recognized in tendering to him on June 12, 1897, two and one half shares of the Neversink Light, Heat & Power Company's stock held by the Klapperthal Company in exchange for the $500 note of the Neversink Mountain Railroad Company, paid by him and the $1,000 bond of said company he holds as security therefor. He complains, in one of his letters to the defendants, that their offer did not embrace any al-

lowance for interest.   But neither was any distribution of said stock made to the indorsers on account of interest upon notes paid for by them for which they held bonds of the Neversink Mountain Railroad Company.   Indeed, no stock was given to them at all for those notes, but only for such as they had paid and held without security or equivalent of any kind.   The question of costs seems to be settled by the rule applied in Williams v. Church, 193 Pa. 120.

From the foregoing findings and discussion result the following :

### CONCLUSIONS.

(*a*) The three corporations, the Klapperthal Company, the Neversink Mountain Railroad Company and the Neversink Light, Heat & Power Company must be treated in equity as in fact they were projected and organized to act and did act, and were treated by all the parties to this suit, viz : as virtually branches of a single organization having mutual and interdependent interests and co-operating on lines of common interest and policy for the furtherance of the purposes and the development of the property of the Klapperthal Company, the parent corporation.

(*b*) This relation subsisting between them constituted a sufficient consideration for the assumption on the part of the Klapperthal Company of the duty of reimbursing the indorsers of the Neversink Mountain Railroad Company's notes for any losses sustained or to be sustained by them in consequence of their indorsements past or future.

(*c*) Having due regard to the value of the Neversink Light, Heat & Power Company's stock, a valuation of the same at $200 per share for the purpose of discharging, by transfer thereof to the indorsers, their claims for reimbursement from the Klapperthal Company, was eminently conscionable and fair towards said company.

(*d*) Transfers of said stock for such purpose and at that rate having been regularly made to said indorsers to an amount equal to the liabilities assumed and discharged by them (deducting therefrom the amount of the notes paid for out of the proceeds of their purchase of forty-three bonds of the Neversink Mountain Railroad Company, which bonds, nominally

worth $43,000, but actually worth less than the face of said notes), equity will not, even in the absence of any antecedent undertaking on the part of the Klapperthal Company to reimburse them, compel them to surrender any part of said stock at the suit of the plaintiff, with the certain result of depriving them of reimbursement pro tanto for the advances made by them virtually and really in aid of the Klapperthal Company and incidentally of the plaintiff himself as a holder of its stock.

(*e*) The resolution of the stockholders of the Klapperthal Company, of November 21, 1891, was, however, an express undertaking to reimburse the indorsers of the Neversink Mountain Railroad Company's notes, and as such a binding contract between them and the Klapperthal Company.

(*f*) Construed merely as an undertaking to reimburse the indorsers for expenditures in indorsing and taking up notes of the Neversink Mountain Railroad Company, antedating the passage of the resolution of November 21, 1891, the latter strictly and expressly warranted all the distributions subsequently made to the indorsers of shares of the Neversink Light, Heat & Power Company stock, except fifty-five shares included in the distribution of August 1, 1896, representing $11,000 of notes of later date, and ten shares distributed to them on June 12, 1897, in payment of their outlay in the construction of the pavilion.

(*g*) The real intent and effect of the resolution of November 21, 1891, however, were to evidence and create a contract between the Klapperthal Company and the indorsers of the Neversink Mountain Railroad Company's notes to reimburse them for whatever they should be obliged to pay by reason of their indorsements of such notes. Whether then already paid or running or thereafter to be made; and as such justified all the transfers to them of shares of the Neversink Light, Heat & Power Company on such account as made in the distributions of both August 1, 1896 and June 12, 1897.

(*h*) The contract as thus evidenced by the resolution of November 21, 1891, having been fully executed on the part of the indorsers, and the Klapperthal Company having received the full benefit of its performance by them, said company was thereafter and is now estopped from denying its validity as binding upon it.

(*i*) The plaintiff in this suit is estopped from denying (1)

that the intent and effect of the resolution of November 21, 1891, were to evidence and create a contract of indemnity between the Klapperthal Company as guarantor and the indorsers in respect of liabilities incurred and to be incurred by them by indorsements of notes of the Neversink Mountain Railroad Company both theretofore and thereafter made; (2) that the distribution of August 1, 1896, to said indorsers of shares of the Neversink Light, Heat & Power Company stock was lawfully made in pursuance and part execution of said contract according to its proper and actual meaning and effect; (3) that the distribution of June 12, 1897, of 125 additional shares of said stock to said parties was equally justified by and lawfully made under the same; (4) that the application before and under resolution of the directors of the Neversink Mountain Railroad Company, of November 15, 1893, of the bonds and proceeds of bonds deposited by said company with the Pennsylvania Trust Company under resolution of June 18, 1892, was lawful; or (5) that the transfer by the Klapperthal Company on June 12, 1897, of twelve shares of the Neversink Light, Heat & Power Company stock in payment of the pavilion, etc., was equally so.

(*j*) The transfer, on June 12, 1897, of twelve shares of said stock in payment of the pavilion and the ground occupied by the same, was a lawful transaction (apart from any question of estoppel operating against the plaintiff's right to impugn the same) in view of the relation of the Klapperthal Company to the Neversink Mountain Railroad Company, of the manner in which the pavilion project originated and was carried out, of its actual cost, and of the actual value of the shares transferred as compared with the same.

(*k*) The claims of the defendants Brooke, Baer, Smith and Leaf involved in the suit to No. 65, February term, 1900, and the judgment obtained therein, are valid demands in the hands of the defendant Yost, as their agent, against the Klapperthal Company, and no reason for restraining or interfering with the enforcement of the same has been shown in this case.

(*l*) The allegations in plaintiff's bill of breach of trust and misappropriation of the Klapperthal Company's assets by, and of bad faith and illegal combination on the part of, the defendants being unsustained by the facts of the case, said bill must be dismissed; saving, however, to the plaintiff the right to re-

ceive from the Klapperthal Company, in exchange for the $500 note of the Neversink Mountain Railroad Company (together with the $1,000 bond thereof) held by him, two and one half shares of Neversink Light, Heat & Power Company stock (or at the option of either party the equivalent thereof in money at the rate of $200 per share) together with the amount of the dividends declared thereon since June 12, 1897.

(*m*) The costs of this suit must be paid by the plaintiff.

*Error assigned* was decree dismissing the bill.

*C. H. Ruhl*, for appellant.

*Jefferson Snyder*, of *Snyder & Zieber*, for appellees.

PER CURIAM, May 19, 1902:

The decree in this case is affirmed on the opinion of Judge ENDLICH.