# GILL v. BENJAMIN FRANKLIN REALTY & HOLDING CO. *

## No. 4221.

Circuit Court of Appeals, Third Circuit.
Aug. 13, 1930.

Rehearing Denied Sept. 16, 1930.

Owen J. Roberts, of Philadelphia, Pa., James E. Mathews, of Cleveland, Ohio, C. Russell Phillips, of Philadelphia, Pa., and Andrews & Belden, of Cleveland, Ohio, for appellant.

Stanley Folz and Sundheim, Folz & Sundheim, all of Philadelphia, Pa., for appellees Benjamin Franklin Realty & Holding Co. and others.

Allen Hunter White, Frederic L. Ballard and Ballard, Spahr, Andrews & Ingersoll, all of Philadelphia, Pa., for appellee Real Estate Land Title & Trust Co.

Charles W. Gamble and Ralph B. Evans, both of Philadelphia, Pa., for appellee Gimbel Brothers, Inc.

Before BUFFINGTON and DAVIS, Circuit Judges, and JOHNSON, District Judge.

DAVIS, Circuit Judge.

The plaintiff-appellant is a contractor. He sued the defendants in the District Court to recover $1,151,185.53 which he alleged was due him on a contract to build the Benjamin Franklin Hotel at the southeast corner of Ninth and Chestnut streets, Philadelphia. The hotel was completed, and this suit arose over a disagreement as to the amount of the balance due plaintiff and as to whether or not the balance found to be due was payable in bonds or in cash.

The learned trial judge found that $887,-643.78 was due the plaintiff, and neither side has appealed from that finding; so the question of amount is not of the case, and the sole issue here is the medium of payment whether this balance due must be paid entirely in cash, as plaintiff contends, or part in cash and part in "second mortgage, Series 'B,' bonds," as defendants contend. The trial judge found that $161,643.78 was payable in cash and the balance of $726,000 was payable in "second mortgage, Series 'B,' bonds."

This issue must be determined by the interpretation given to the following portion of paragraph 13 of the contract:

"It is agreed that payments to be made by the Owner to the Contractor hereunder shall be made in cash up to the sum of Four Million Three hundred fifty Thousand Dol

*Rehearing denied September 16, 1930.

lars ($4,350,000.00), and when that sum shall have been paid in cash, all further payments due from the Owner to the Contractor shall be paid and entirely liquidated by the delivery by the Owner to the Contractor in lieu of cash, of second mortgage, Series 'B,' bonds to be issued by the Owner, which bonds shall be taken at 90 per centum of their face value said bonds shall bear interest at the rate of 6 per centum from the date of delivery, shall be part of a total second mortgage bond issue of $3,400,000.00 subject to a first mortgage bond issue of $6,600,000.00. If, however, for any reason the total price to be paid the Contractor shall exceed $4,375,000.00, such excess up to $50,000.00 shall be paid by the Owner to the Contractor in cash, and any sum beyond said $50,000.00 shall be paid by the owner to the Contractor by the delivery of second mortgage, Series 'B,' bonds at 90 per centum as aforesaid in lieu of cash."

Pursuant to these provisions in the contract, a first mortgage, securing bonds to the extent of $6,600,000, divided into two classes, class A bonds to the amount of $4,300,000, and class B bonds to the amount of $2,300,000, was placed upon the hotel property. The A bonds were given priority in payment of principal and interest over the B bonds. The bonds of both classes were secured by the lien of this mortgage.

A second mortgage, securing bonds to the amount of $3,400,000, divided into two classes, class A bonds to the amount of $2,100,000 and class B bonds to the amount of $1,300,000, was also placed on the hotel property. The class A bonds were given priority in payment over the class B bonds, both in principal and interest. Both the A and B bonds were secured by the lien of the second mortgage.

The bonds which the contractor agreed to take in lieu of cash over and above $4,350,000 were to be "second mortgage, Series 'B,' bonds," which were to be taken at 90 per centum of their face value, bear interest at 6 per centum from the date of delivery, and be part of a total second mortgage bond issue of $3,400,000, subject to first mortgage bond issue of $6,600,000.

The division of the bonds secured by the mortgages into class A and class B bonds did not increase the *amount* of the lien of either mortgage and so did not in this respect violate the terms of the contract.

The appellant says that he is not required to accept the bonds which have been issued, set aside, and kept for him because they do not conform to the terms of the contract; that, because of the nature of the liens which the Hotel Company has placed upon its property, it is now impossible for it to create and issue such bonds as are described in the contract, and it must therefore be held to have elected to pay in cash the balance due plaintiff.

The question at once arose as to whether or not parol evidence would have to be admitted in order to interpret the terms of the contract so as to determine whether or not the bonds set aside for the plaintiff are those described in the contract. The appellant says that parol evidence was not admissible because the contract provisions relative to payment in bonds to the contractor are clear and unambiguous and cannot be varied or added to by parol evidence. The trial judge held that the words "Series 'B,'" qualifying the word "bonds," are ambiguous.

We cannot dogmatically say what "Series 'B'" means when applied to the position of the lien of bonds secured by a second mortgage. The testimony clearly shows that these words do not have any generally accepted meaning when thus used. They therefore brought into the description of the bonds a real ambiguity.

When the language used in a written instrument is ambiguous, vague or uncertain and is fairly susceptible of two constructions, parol evidence is always admissible to show the situation of the parties and the circumstances under which the written instrument was executed for the purpose of ascertaining the intentions of the parties and of properly construing the instrument. There is one paramount rule of construction to which all others are subordinate and that is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles in order that the parties may be bound by what they intended to be bound by and nothing more. Merriam v. United States, 107 U. S. 437, 2 S. Ct. 536, 27 L. Ed. 531; Bubb v. Oil Company, 252 Pa. 26, 97 A. 114; Bangor Slate Company v. Bangorvein Slate Company, 270 Pa. 161, 113 A. 190.

But the appellant says, if the words describing the bonds in the contract are ambiguous, the ambiguity is *patent* and may not be clarified by parol evidence, and quotes Lord Bacon's rule in support of his position. But that rule has not been generally accepted in this country. The modern rule with regard to removing patent ambiguity in an instrument is this: Patent ambiguity which

cannot be explained by parol evidence, but remains uncertain and doubtful after the court has received extrinsic evidence of the facts and circumstances which surrounded the parties at and about the time the instrument was executed, is incurable by the introduction of evidence which would in effect add new terms to the instrument. But, where doubt exists as to the meaning of the words themselves or as to their application under the surrounding circumstances, parol evidence may be admitted to show the circumstances, to throw light on the intentions of the parties, as evidenced by the words they used. In order to ascertain their intentions, the judge must put himself in the place of the parties and then see how the terms of the instrument affect the property or subject-matter with which they were dealing. The effect of parol evidence thus admitted is not to vary the language of the instrument, but to explain the sense in which the parties understood it. 22 Corpus Juris, §§ 1599, 1600; Mechanics' Bank of Alexandria v. Bank of Columbia, 18 U. S. (5 Wheat.) 326, 5 L. Ed. 100; Miller v. Fichthorn, 31 Pa. 252; Reed v. Insurance Company, 95 U. S. 23, 24 L. Ed. 348; United States v. Bethlehem Steel, 205 U. S. 105, 27 S. Ct. 450, 51 L. Ed. 731; Lowrey v. Hawaii, 206 U. S. 206, 27 S. Ct. 622, 51 L. Ed. 1026; Myers' Estate, 238 Pa. 195, 211, 86 A. 89; Buckbee v. Hohendadel (C. C. A.) 224 F. 14, 25, L. R. A. 1916C, 1001, Ann. Cas. 1918B, 88.

In order to construe the words "second mortgage Series 'B,' bonds," the court admitted parol evidence, not to vary the contract, but to show the facts and circumstances surrounding the parties when they were negotiating for the contract and when it was actually executed, and we think that he did not commit error in so doing. From that evidence the judge who, sitting as chancellor, saw the witnesses, heard them testify, and weighed their credibility, found the facts, and we are bound by his findings if the findings have any substantial evidence to support them. Metropolitan National Bank v. Rogers et al. (C. C. A.) 53 F. 776; Wald v. Longacre (C. C. A.) 34 F.(2d) 25; Thorndell v. Munn, 298 Pa. 1, 147 A. 848.

One of the outstanding facts on which the decision of this case largely depends is what Mr. Albert M. Greenfield told Mr. Gill about these bonds on February 13, 1923, the day the contract was signed. Mr. Gill says that Mr. Greenfield told him that the bonds to be delivered to him would come behind the first mortgage bonds purchased by the Land Title Company and behind the second mortgage bonds issued to the owners of the property, and be the same kind of bonds that Mr. Trumbauer, the architect, was purchasing to the extent of $50,000 and Mr. Greenfield to the extent of $100,000, the same kind of bonds that the building and loan associations were taking; that back of Mr. Gill's bonds would be bonds for the furniture to be taken by the Gimbel Brothers and the Lit Brothers to the extent of a million and a half dollars. The "second mortgage, Series 'B,' bonds," set apart and kept for the plaintiff, are not the bonds above described. Mr. Greenfield absolutely denies making these statements to Mr. Gill. There was thus a sharp issue of fact between them. The learned trial judge specifically found as a fact that Mr. Greenfield did not on February 13, 1923, or at any other time make any statements to Mr. Gill, from which he could reasonably have understood that the bonds which the hotel company proposed to issue and which he promised to take were substantially different from the bonds actually issued and held for him. This finding, the court said, was based not only upon the actual disclosures of the evidence, but also upon the probabilities of the case; that a person of Mr. Greenfield's intelligence and integrity would not deliberately misrepresent to Mr. Aronberg and Mr. Gill, men of wide experience and great intelligence, the facts about bonds and a plan of financing, which they had plenty of opportunity to know and with which they could easily familiarize themselves.

He further specifically found that Mr. Greenfield made no statement to Mr. Gill which could reasonably be understood to mean that there was to be any mortgage subsequent in lien to the lien of the mortgage securing the bonds which he (Mr. Gill) was to get, or that the bonds which he was to get would be the direct obligation of the hotel company, rather than that of a straw man. On the contrary, he found that Mr. Greenfield told Mr. Gill that the bonds would not be the direct obligation of the hotel company, but would be the obligation of an individual, straw man, in order to make them legal for trust investment in Pennsylvania.

He further found that Mr. Greenfield told Mr. Gill prior to February 13th that the "second mortgage, Series 'B,' bonds" would be subordinate in lien to the "second mortgage, Series 'A,' bonds," that Mr. Greenfield fully disclosed to Mr. Gill their plan of financing, the kind of bonds to be issued and the kind of bonds which he was to receive, and

that he was justified in believing that Mr. Gill understood these facts.

We think that the evidence justifies the conclusions reached by the trial judge as to the facts.

William H. Bodine, Esq., represented Mr. Gill and was present in Mr. Trumbauer's office on February 13, 1923, when Mr. Gill signed the contract, and it is unthinkable that a lawyer so able, careful, and conscientious as he is would have allowed his client to sign a contract which was not understood. Mr. Bodine had but one criticism of the bonds: They had not been issued by the owner, the hotel company, but by one Rothwell, a straw man. He accordingly suggested that the hotel company should guarantee their payment, and this was done to the satisfaction of everybody and apparently with the approval of the bonds by Mr. Gill.

The mortgages were recorded and became notice to the world of the facts which they contained before notice was given to Mr. Gill to begin work. This was the time for Mr. Gill to raise any objection that he had to the mortgages or bonds or the position of their liens, and, not having done so, he will not be allowed to speak after the hotel company changed its position based upon his acquiescence. Pacific Mill & Mining Company v. Leete (C. C. A.) 94 F. 968; Schweyer Electric & Manufacturing Co. v. Regan Safety Devices Company, 4 F.(2d) 970 (C. C. A. 2); New York City v. Pine, 185 U. S. 93, 22 S. Ct. 592, 46 L. Ed. 820.

The provisions for the commission or annual premium for guaranteeing the bonds and the payment of dues and premiums to building and loan associations (the means for amortizing the bonds) are ordinary and usual in bonds of this character when purchased by such companies as bought these bonds. The evidence shows that Mr. Gill knew who was to purchase the first mortgage A bonds and also that building and loan associations were to purchase the first mortgage B bonds. The trial judge found that Mr. Greenfield was justified in reasonably apprehending that Mr. Gill understood that these provisions would be attached to the bonds, and the evidence justifies the finding. Consequently these provisions were understood by Mr. Gill, were implicit in the contract, not a violation of it, and do not furnish a legal ground for refusing to take the bonds.

When individuals organize a corporation for the purpose of carrying out a fraudulent scheme, a court of equity, as appellant asserts, will always disregard the corporate entity and place the responsibility for the corporate action upon the individuals who constitute the corporation. J. J. McCaskill Co. v. United States, 216 U. S. 504, 515, 30 S. Ct. 386, 54 L. Ed. 590; Kendall v. Klapperthal, 202 Pa. 596, 607, 52 A. 92; Stony Brook Lbr. Co. v. Blackman, 286 Pa. 305, 133 A. 556. But there is no evidence when properly interpreted with reference to the subject-matter, as it must be, Schnee et. al. v. Elston et ux., 299 Pa. 100, 106, 149 A. 108, upon which the parties were negotiating, that justifies the conclusion that men of the honor and character of Mr. Greenfield and those composing the Real Estate Land Title & Trust Company, Gimbel Brothers, Lit Brothers and the Public Ledger Company, incorporated the hotel company or did anything else "for the purpose of carrying out a scheme of injustice, fraud, wrong or illegality."

Accordingly, the rights of Mr. Gill are against the hotel company and not the persons who compose it or the other companies, and those rights, as the trial court found, he knew and understood when he signed the contract. He is therefore entitled to receive the amount the trial judge found to be due him, $887,643.78. Of this amount, $161,643.78 is payable in cash and $726,000 in "second mortgage, Series 'B,' bonds."

These conclusions dispose of the questions essential to the decision of this case, and the decree of the District Court is affirmed.