### In re UNITED PUBLIC UTILITIES CORPORATION.

#### Civ. No. 347.

District Court, D. Delaware.

Dec. 11, 1943.

John F. Davis, Sol., Roger S. Foster, Counsel, and John W. Christensen, all of Philadelphia, Pa., for Securities and Exchange Commission.

Philip H. Strubing and Francis H. Scheetz, both of Philadelphia, Pa., and Caleb R. Layton, 3rd (of Hastings, Stockley and Layton), of Wilmington, Del., for United Public Utilities Corporation.

J. B. Colahan (of Townsend, Elliott & Munson), of Philadelphia, Pa., for Provident Trust Co., of Philadelphia, indenture trustee.

LEAHY, District Judge.

This matter is here on an application of the Securities and Exchange Commission

pursuant to Sections 11(e), 18(f) and 25 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79k(e), 79r(f), 79y,[1] to approve a certain plan of UPU as fair, equitable and appropriate to effectuate the provisions of Section 11(b) of the Act.

UPU is a registered holding company. It has $6,880,850 of Bonds outstanding collateralized by securities of its subsidiaries among which were Texas Ice and Refrigerating Company and Cap F. Bourland Ice Company. The Commission on March 4, 1942, pursuant to Section 11(b)(1), directed UPU to dispose of its investments in certain subsidiaries including Texas Ice and Bourland. The plan filed by UPU under Section 11(e) provided for payment of certain liquidating dividends by Texas Ice and Bourland, the sale of UPU investments in those companies and application of the proceeds to redemption of the bonds on January 1, 1944, if the proceeds were available by that time, or through purchase of Bonds in the open market or at the next redemption date, July 1, 1944. The Trust Indenture (Art. IV, Secs. 1 and 3) determines the method by which the proceeds from collateral are applied to redemption of the Bonds, viz., Indenture Trustee, when instructed by UPU, determines which of the two series of Bonds can be redeemed most advantageously to UPU. If there is to be a partial redemption the usual selection by lot occurs with provisions for notice by newspaper publication. After the Indenture Trustee is put in funds and the redemption date passes, the Bonds called if not turned in cease to bear interest. Where purchase is made in the open market, the purchase may not exceed the current redemption price. Presently, the Indenture Trustee advises that the 6% Series A Bonds should be redeemed.

The legal question to be decided here, aside from finding whether the plan is fair and equitable, centers upon one paragraph in the Trust Indenture which is also contained in each of the bonds. This provision provides: *"This bond may, at the option of the Company, be redeemed on any interest date prior to its regular maturity, after at least sixty days' notice published in the manner provided in said Indenture, by paying the principal hereof and the interest accrued hereon to the date fixed for such redemption, plus a premium equal to the following percentage of the principal, to wit: If such redemption date occur on or prior to January 1, 1940 5%,— this premium successively decreasing one per centum of the principal on July 1, in each of the years 1945, 1950 and 1955; all in the manner and upon the conditions provided in said Indenture."* (Italics supplied.) The provision is obviously ambiguous, and raises the question whether the holders of bonds to be redeemed on January 1, 1944, are entitled to a 4% or 5% premium.

■ I. *Proceedings before the Commission.* The Commission construed the language of the provision and concluded that the Trust Indenture provided that a 4% premium was due upon any redemption occurring between July 1, 1940, and July 1, 1945. While certain parol evidence had been adduced and received by the Commission in order to disclose the intention of the parties to the Trust Indenture, it specifically stated in its opinion that in reaching its construction it ignored such evidence. Passing for the moment the correctness of the Commission's interpretation, I think the character of the evidence adduced is so helpful in ascertaining the original intention of the parties there is no reason to ignore it.

■ Since the parol evidence rule is a rule of substance, Shackelford v. Latchum, D.C. Del., 52 F.Supp. 205, American Crystal Sugar Co. v. Nicholas, 10 Cir., 124 F.2d 477, 3 Wigmore on Evidence, 3rd Ed., Vol. 9, § 2400, the scope of the rule must be determined either by the law of Pennsylvania (the place where redemption is to be performed) or the law of Delaware. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477. I find it unnecessary, however, to explore this problem as the scope of the parol evidence rule is the same in both states. This circuit in Gill v. Benjamin Franklin Realty & Holding Co., 3 Cir., 43 F.2d 337, 338, involving an appeal from a district court of Pennsylvania had

---

[1] In this opinion I refer to the Securities and Exchange Commission as the "Commission"; to United Public Utilities Corporation as "UPU"; to the United Public Utilities Corporation Trust Indenture dated January 1, 1935 as the "Trust Indenture"; to Provident Trust Company of Philadelphia, trustee under said indenture, as "Indenture Trustee"; to the 6% Series A and 5½% Series B Collateral Trust Bonds outstanding under the indenture as "Bonds"; and to the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq. as the "Act".

occasion to pass upon this problem. In that case the court held that when language appears in a writing which being ambiguous is susceptible of two constructions, courts may always utilize parol evidence to seek out the precise circumstances under which the writing came into existence in order to find the real intention of the parties, and thus construe the instrument in spite of the intention lurking behind the ambiguity. The Pennsylvania state decisions are in accord with this view, Dorrington v. Manning, 135 Pa.Super. 194, 4 A.2d 886; In re Sarver's Estate, 132 Pa.Super. 238, 200 A. 709; Security Trust Co. v. Stapp et al., 332 Pa. 9, 1 A.2d 236; Henry's Pennsylvania Trial Evidence, pp. 384, 387, and so is the leading Delaware decision of Plunkett v. Dillon, 4 Del. Ch. 198.

■ The evidence before the Commission shows (1) the circumstances attending the issuance of the Bonds and (2) the parol testimony of the intention of the parties who negotiated the terms of the Bonds. It may be summarized without inordinate delay.

The Bonds were issued under a plan of reorganization of a predecessor company, the United Public Utilities Company, consummated on January 1, 1935, under Sec. 77B of the Bankruptcy Act, 11 U.S. C.A. § 207. The Bonds were issued in exchange for an outstanding issue of $14,956,800 6% Series A and 5½% Series B Collateral Trust Bonds, issued April 1, 1927 and maturing April 1, 1947. The premium clause in the old bonds is significant. It provided: *"If such redemption date occur on or prior to April 1, 1932, 5%, this premium decreasing one-fourth of one per centum of the principal on each October 1, thereafter; all in the manner and upon the conditions provided in said Indenture."* (Italics supplied.)

The plan of reorganization was the result of negotiations of certain formal committees[2] representing holders of securities in the old company, acting in collaboration with the receiver and later the court's trustee. All the committees approved the plan of reorganization, including the present Trust Indenture, which was likewise approved by the court. The members of the Committees and the court's trustee all testified that they had participated in the negotiations which fixed the conditions of the Bonds. Their testimony shows that it was everyone's intention that the premium should be 5% for the first 5 years, decreasing 1% for each 5-year period thereafter and to the best of their recollection no other premium provision was ever suggested by anyone, although a suggestion had been made that they dispense with all premiums. At least, no suggestion was made that the premium be 5% for 10 years (1935–1945) with a reduction of 1% for each 5-year period thereafter. On the contrary, all the parol evidence points to an understanding that the redemption price was to be 105% for the first five years and to be reduced thereafter at the rate of 1% for each five years.[3]

II. *The single objection to the plan.* The Bonds were, under the original reorganization plan, initially distributed to the holders of the old bonds. Since then, however, they have been dealt in extensively in the market and are now substantially in the hands of the general public. The Indenture Trustee seeks to justify its contention for a 5% premium on the ground that the ambiguity should be resolved against UPU as it was of the latter's making. The Indenture Trustee argues that if there is an ambiguity created by the original parties, a court ordinarily clears such ambiguity by finding the real intention of the parties, but where the Bonds are transferred to an innocent purchaser for value the court should charge the issuer of the Bonds with any mistake which has crept into the instrument and all doubtful meaning should be resolved against the party who drafted the instrument. I do not know how innocent the purchasers of the Bonds may have been, but they obviously accepted the instrument with notice of the ambiguity lurking in the premium clause. As there is no attempt here to contradict a clear statement or add a new condition

[2] These committees were: (1) First Lien Bondholders Committee representing $11,992,800, or 80%, of old bonds; (2) the Bard Committee representing holders of all classes of securities, including old bonds; and (3) the Joint Reorganization Committee, consisting of three members of the first committee and two members of the second.

[3] This is the first occasion where the Bonds have been called for redemption. Heretofore, the Indenture Trustee has always been able to purchase Bonds at prices of 105 or less during the first 5-year period and at 104 or less during the second 5-year period.

not agreed to by the original parties to the instrument, I cannot accept the Indenture Trustee's argument.

The Commission was content to find a 4% premium due after construing the provision without resort to the collateral evidence which had been brought forward. The Commission said: "After careful examination of the language of the redemption provision and its context we are satisfied that, despite the obvious error in draftmanship, the indenture provides for a reduction of 1% in the initial 5% premium in each 5-year period after January 1, 1940. Use of the words 'on or prior to January 1, 1940' in describing the premium payable in the first 5-year period carries the clear implication that the first decrease of 1% in premium would occur on July 1, 1940, at the end of the first and the beginning of the second 5-year period. This construction results in a uniform 1% change in premium for each 5-year period over the life of the bonds and leaves 1% rather than 2% as applicable throughout the last 5-year period. Accordingly, we find that the indenture provides for a 4% premium upon a redemption effected between July 1, 1940 and July 1, 1945." From an objective approach I think the Commission's decision is sound. The mere addition of "1940" before "1945" involves no contradiction of the clause providing for a premium of 5% on or before January 1, 1940. If the contention of the Indenture Trustee is correct, one must strike out "January 1, 1940" and insert "January 1, 1945" in the opening clause, both operations being in contradiction of that clause, and it supplies an irregular pattern of a 5% premium for 10 years, decreasing 1% at 5 year intervals, resulting with a high premium of 2% for the last five years.

In any event, any difference of opinion on an objective construction of the language used must give way in view of the unimpeached and credible testimony which discloses what was, in fact, the intention of the parties. From this evidence it is clear that the draftsman of the present Bonds was simply attempting to follow the pattern of the premium clause of the old Bonds. Moreover, the claimed construction is the natural one. The empirical reason for redemption premiums is to compensate investors for involuntary termination of their investment and for the trouble of finding new investments. Investment management would be difficult indeed if investment obligations could be redeemed at will without any compensation to the owners of the obligations. The same empirical reason is recognized in current real estate mortgages which prohibit payment by mortgagor without consent of mortgagee, who also has the right to exact a penalty on payment before the specified time. The usual bond pattern is an even decrease in premium rate. Seldom does one see a provision for a 2% premium as time approaches the last premium redemption date, for the investor has had stability in investment portfolio and there is consequently no reason for such high compensation.

 I conclude the plan is fair, equitable and appropriate. Without discussion, I think there can be no question but that the call for redemption is a valid call. Finally, I determine the proper premium payable on such redemption to be 4% of the principal. A form of decree may be submitted directing UPU to comply with the Commission order of October 14, 1943 and to carry out the plan.