Fidelity-Philadelphia Trust Co. et al. *v.* Simpson, Appellant.

*Equity — Fraud — Control of corporation—Purchase of stock— Statute of frauds—Laches—Measure of damages.*

1. The control of a corporation is a valuable right.

2. The value of the stock carrying such control, must be treated as worth the contract price at which one stockholder agrees to sell his stock to another.

3. Where a minority stockholder, desiring to secure control of a corporation without purchasing all of the majority, which the owners thereof would sell only as a whole, enters into a fraudulent scheme by which a third party would ostensibly buy all of the majority stock, but have the contract so drawn that after securing the desired number of shares he could escape further liability on paying a specific amount as liquidated damages, such minority stockholder, after having acquired the control by such scheme, will be liable to his vendors in damages for his fraudulent act.

4. In such case, the measure of damages is the contract price of the shares left in the hands of the owners, less the price which they asked for them after they had lost control of the corporation, with a further deduction of the amount paid as liquidated damages, to which will be added interest at the rate of six per cent damages from the date of the commission of the fraud.

5. The fact that the stockholders delayed for twenty-three years to assert their rights will not defeat recovery where it appears that the fraudulent acts of the purchaser had made discovery impossible, and that a bill in equity was promptly filed after an accidental discovery of the purchaser's letter book revealed the whole transaction.

6. The question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but upon whether, under the circumstances of the particular case, plaintiff is chargeable with want of due diligence in failing to institute or prosecute the proceeding.

*Evidence—Expression of intention—Statement of fact—Fraud.*

7. An expression of intention, purpose or opinion, may amount to a statement of fact, as where a person fraudulently misrepresents his intention in doing a particular act to the damage of another.

*Equity — Jurisdiction — Remedy at law — Decision in limine— Act of June 7, 1907, P. L. 440.*

8. The court will not consider an averment of an adequate remedy at law in a defendant's answer to a bill in equity, where such question was not raised in limine as required by the Act of June 7, 1907, P. L. 440.

Mr. Justice SCHAFFER filed a dissenting opinion. Mr. Justice FRAZER dissented on the measure of damages, and Mr. Justice KEPHART on the question of laches.

Argued May 16, 1928.   Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

Appeal, No. 201, Jan. T., 1928, by defendant, from decree of C. P. No. 2, Phila. Co., Dec. T., 1926, No. 14810, on bill in equity in case of Fidelity-Phila. Trust Co., successor to Phila. Trust, Safe Deposit and Ins. Co., sole surviving trustee of the estates of Thomas Simpson and James Simpson et al. v. W. Percy Simpson. Decree modified and affirmed.

Bill to redress a fraud.

Trial before Gordon, J., who entered a decree against defendant for $940,482.16.   On exceptions, a decree was entered for $616,590.

The opinion of the Supreme Court states the facts.

Decree for plaintiffs for $616,590.   Defendant appealed.

*Error assigned,* inter alia, was decree, quoting record.

*Owen J. Roberts,* with him *Townsend, Elliott & Munson* and *George G. Chandler,* for appellant.—No actionable fraud was practiced by the appellant upon the trustees: Miller v. Fulmer, 25 Pa. Superior Ct. 106; Bughman v. Bank, 159 Pa. 94; Sheritt & Co. v. Eng. Co., 73 Pa. Superior Ct. 147.

No confidential relation was proved such as to require disclosure: Morrow v. Wilson, 266 Pa. 394; Yeaney v. Keck, 183 Pa. 532; Allegheny Coke Co. v. Hillman, 275 Pa. 191; Bank v. Anderson & Co., 194 Pa. 205; Geddes' App., 80 Pa. 442; Clark v. Clark, 174 Pa. 309; Latta v. Kilbourn, 150 U. S. 524.

The proofs established that no special damages were suffered by the trustees: Weaver v. Cone, 174 Pa. 104; Cunningham v. Ray, 263 Pa. 492; Duroth Mfg. Co. v. Cauffiel, 243 Pa. 24; McWilliams v. Altemus, 288 Pa. 277.

The arbitrary valuation of $60 per share is without warrant of law or fact.

There was an erroneous allowance of interest on an unliquidated tort claim: Long v. McAllister, 275 Pa. 34; Erie City Iron Works v. Barber, 102 Pa. 156; Cole v. High, 173 Pa. 590; Friend v. Hazlett, 6 D. & C. 522.

Appellees are chargeable with laches: Kinter v. Trust Co., 274 Pa. 436; Patton v. Trust Co., 276 Pa. 95; Stewart's Est., 278 Pa. 318; Grant v. Lovekin, 285 Pa. 257.

*Ellis Ames Ballard,* of *Ballard, Spahr, Andrews & Ingersoll,* with him *Charles I. Thompson,* for appellee.— Appellant's conduct constitutes actionable fraud: Croyle v. Moses, 90 Pa. 250; Williams v. Kerr, 152 Pa. 560; Standard Elevator Co. v. Wilson, 218 Pa. 280; Harner v. Fisher, 58 Pa. 453; Hall v. R. R., 257 Pa. 54.

Under the circumstances of this particular case appellees are chargeable with want of due diligence in failing sooner to institute or prosecute this proceeding.

As to the assessment of damages: it is a rational and a legal principle, that the compensation should be equivalent to the injury: Weaver v. Cone, 174 Pa. 104.

OPINION BY MR. JUSTICE WALLING, June 30, 1928:

This bill in equity was filed to obtain redress for loss sustained through the alleged fraud of the defendant, W. Percy Simpson,—herein often referred to as "Simpson,"—in the purchase of corporate stock.   The Eddystone Manufacturing Company was a corporation, chartered about 1880, and located at Eddystone, near Philadelphia, with a capital stock of $1,000,000, divided into 10,000 shares of $100 each, of which stock Lincoln Godfrey, now deceased, and the Philadelphia Trust, Safe Deposit and Insurance Company, held 5140 shares as trustees of the estates of Thomas Simpson and others. Near the close of 1902, Simpson, being the owner per-

sonally and as trustee of some 3100 shares of the stock of the same company, conceived the idea of acquiring sufficient additional shares to give him a controlling interest in the corporation. Godfrey was his uncle by marriage and the Simpsons, for whom the majority interest was held in trust, were his blood relatives. Godfrey was president and the defendant a director of the corporation. They were also jointly interested in a partnership acting as sales agent for the corporation. While the relations of all the above named parties were friendly, defendant thought he could more readily acquire the necessary stock from the trustees through a third party, without being known as purchaser. He therefore employed as his agent for that purpose, Frank P. Hays, a St. Louis banker, who early in January, 1903, approached the trustees with reference thereto. The latter refused to negotiate for a sale of a part of their holdings, by which they would lose control of the corporation, but offered to entertain a proposition for the sale of their entire 5140 shares. This Hays declined, but thereupon he and the defendant entered into a fraudulent scheme by which Hays would ostensibly buy the entire 5140 shares, but have the contract so drawn that upon securing the desired number of shares he could escape further liability on paying a specified amount as liquidated damages. Thus armed, Hays renewed the negotiations for the 5140 shares on the basis that his clients, declining to disclose their identity, were then prepared to make such purchase. The trustees consulted the defendant about the proposed sale of their stock and he, to forestall any suspicion that he might be interested in the purchase, showed them a fake letter which he had procured from Hays offering to buy his stock. After some negotiations, the trustees agreed to sell Hays their entire stock at $135 per share. Hays's telegram, accepting their proposition was as follows: "Gentlemen:—Your proposition to us of date March 13, 1903, offering to us for sale 5140 shares, at

$135 a share, of the capital stock of the Eddystone Manufacturing Company, doing business chiefly at Eddystone, Pennsylvania, received and the same is accepted." The contract as drawn, provides payment for the stock in eight monthly installments and delivery of the stock monthly as paid for. The payments of $80,125 each, for April, May and June, 1903, were made and the 1725 shares of stock thus paid for were delivered accordingly. This, with 175 shares bought of a Mrs. Valentine, gave defendant control of the corporation. It is admitted by both Simpson and Hays that when they arranged for the purchase of this stock, it was definitely understood between them that Simpson would take the 1725 shares only. Their pretense of buying the whole amount was intended to deceive the trustees. In view of which, Simpson had incorporated in the contract the following provisions, viz.: "If at any time you [Hays] shall fail or refuse to make the payments herein required to be made, you shall forfeit to, and the undersigned shall retain free from any claim by you or any person or persons claiming by, through or under you, the sums over paid and remaining in our hands at each time of paying and delivery as follows," and then provides, inter alia, that after the third payment, such failure shall cause a forfeiture of $7,500, as liquidated damages.

As soon as the contract was executed, Hays, under defendant's instructions, began preparations for the intended default. He asked the corporation's president for statements as to resources, liabilities, profits, losses, prospects, inventories, etc., also for a copy of the bylaws and requested that his clients might have a representative on the board of directors. Hays, in addition, sent an expert to make a thorough examination of the property and submit an elaborate report, which was done. This entailed considerable expense, which Simpson justified on the ground that it might avoid future trouble. Hays also spoke of the discouraging outlook for that line of business and the stringency of the money

market.   When the July payment came due, he wrote that his clients were not in harmony as to the venture, and some days later wrote the trustees that he was compelled to abandon further payments and allow the $7,500 forfeiture, which he did.   To keep up the deception, Hays continued to correspond with Godfrey and to speak of the 1725 shares of stock as that of his clients and renewed the request for representation on the board of directors.   Meantime, Simpson made a formal proposition to buy a small corner of the corporation's lot at Eddystone, but withdrew it when it was suggested that it might complicate matters with our St. Louis people, he remarking that "of course we can no longer adjust such matters among ourselves."   During the summer of 1903, Simpson went through the formality of buying the 1725 shares of stock from Hays at $100 a share, although Hays never had a dollar of interest in them. When chided by Godfrey for buying from outsiders in place of buying from the trustees, Simpson replied that he had done so to keep the stock in the family and from possibly falling into hostile hands.

The same year Simpson assumed control of the corporation, had himself elected president thereof and his salary fixed at $15,000 a year, at which it continued for fifteen years, although his predecessor had not, just previously, received any salary.   The voluminous correspondence, of over a hundred letters, extending nearly a year, largely by and between Simpson and Hays (too extended for quotation here), discloses on their part, falsehood, cunning and deceit seldom equalled in human transactions, and fully justifies the finding of the chancellor, affirmed by the court in banc, of affirmative, actionable fraud.   Even an expression "of intention, purpose or opinion, may amount to a statement of fact, as where a person fraudulently misrepresents his intention in doing a particular act to the damage of another": Standard Elevator Co. v. Wilson, 218 Pa. 280, 281.

This fraud, however, occurred in 1903 and this bill was not filed until 1926, and we are confronted by the statute of limitations. Here again we agree with the chancellor and court in banc that the defendant and Hays took such active and skilful means to conceal the fraud as to toll the statute. Simpson's letters abound in exhortations to Hays to conceal what took place relating to the purchase of the stock and said, in effect, that a single exposed letter would be fatal. Beginning with the day the contract was made they employed a code in their correspondence, and in addition Simpson requested and received a return of the letters he had written Hays. Some months after the transaction was closed, Simpson, in writing Hays, earnestly requested not only that he, but all others in his bank, who had knowledge of the transaction, remain indefinitely silent with reference thereto. In the fall of 1903, Godfrey made a visit of investigation to St. Louis and Simpson, knowing of his intention, wrote Hays, in effect, to entertain him nicely, take him out for a ride, etc., but give him no information, which advice was followed. It does not appear that the trustees could have done more to uncover the fraud. Twenty-three years later, Simpson's letter-press book, which he had neglected to destroy, came for the first time to the knowledge and possession of the surviving trustee. It disclosed the fraudulent transaction and was promptly followed by the filing of this bill. Where active steps are taken to conceal fraud, the statute of limitations does not commence to run until its discovery: Smith v. Blachley, 188 Pa. 550; Hughes v. Bank, 110 Pa. 428; Morgan et al. v. Tener et al., 83 Pa. 305. As stated by Mr. Justice FRAZER, speaking for the court, in Hall v. Penna. R. R. Co., 257 Pa. 54, 63: "Where some affirmative act of concealment takes place it is not material whether the concealment is previous, or subsequent, to the beginning of the cause of action. The question is whether there was a design to prevent the discovery of the facts

which gave rise to the action and whether the act operated as a means of concealment." In Higgins v. Crouse, 147 N. Y. 411, 42 N. E. 6, the court, because of fraudulent concealment, sustained an action for fraud brought approximately twenty-four years after the cause of action arose. The trustees, in the instant case, had neither knowledge nor the means of knowledge, and are not chargeable with laches. As stated by former Chief Justice Brown, in Edwards v. Western Maryland Ry. Co., 268 Pa. 228, 230: "The question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, plaintiff is chargeable with want of due diligence in failing to institute or prosecute his proceeding: Townsend v. Vanderwerker, 160 U. S. 383." Laches does not depend upon the statute of limitations, but whether due diligence has been shown: McGrann v. Allen et al., 291 Pa. 574. The bill in the instant case, as filed, prayed for specific performance of the contract, but as the corporation had recently authorized an issue of preferred stock to the par value of one million dollars, to which plaintiff had assented, such decree could not be granted (otherwise it might have been; see Rumsey v. Railroad Co., 203 Pa. 579; 36 Cyc. 560, 562), and the prayer of the bill was amended so as to ask a decree for damages, which the court in banc awarded. Defendant has appealed.

While defendant's answer avers an adequate remedy at law, no steps were taken to have that question decided in limine, as required by the Act of June 7, 1907, P. L. 440. Hence, the case was properly proceeded with in equity: Bank of Pittsburgh v. Purcell et ux., 286 Pa. 114; New York & Pa. Co. v. N. Y. Central R. R. Co., 280 Pa. 297.

On the question of damages, it is clear that, by the fraud complained of, the trustees were deprived of a right, viz., the control of the corporation, which the

answer concedes was valuable. We agree with the lower court that the value of the stock carrying such control must be treated as worth the contract price, to-wit, $135 per share. The question is, what was the fair value of the 3415 shares left in the hands of the trustees after the defendant had secured the balance and therewith the control of the corporation. This was what might be termed a closed corporation, in which the stock had no fixed market value, but was of the par value of $100 a share, had a book value of $173 and according to the statement of Godfrey, president of the corporation and also one of the trustees, liquidation value of $100 per share. At the same time the trustees offered some of this stock to defendant at $110 a share, and in the latter's pretended purchase from Hays the stock was valued at $100. This latter fact would be evidence against Simpson. Prior to 1903 the corporation had in general a large earning capacity, and, subsequently, one on the average much smaller. In our opinion, the court in banc erred in fixing the value of the stock in question at $60 a share on the basis of earnings since 1903 and of two small sales made in 1926, ignoring all the other facts and circumstances bearing on the question of value in 1903. Of all the evidence, we conclude the most reliable as to value of the stock remaining in the hands of the trustees, after they had lost a controlling interest in the corporation, was the price they asked therefor, to-wit, $110 a share, which we adopt. Thereunder, plaintiff's damages were the difference between the contract price of $135 and that, or $25 a share on the 3415 shares, in all $85,375, from which the $7,500 paid on account of the prearranged breach of contract should be deducted, leaving a balance of $77,875. The rule as to stock value in such case is stated by Mr. Justice KEPHART, in McWilliams v. Altemus, 288 Pa. 277, 279, that: "Where stock has been issued which has no market value, the intrinsic or real worth is the measure of damages: Duroth Mfg. Co. v. Cauffiel, 243 Pa. 24,

30. In an action to assess damages for breach of contract which promised, as one of the considerations, common stock of a company to be organized, but which was not, the measure of damages is the intrinsic or real value as of the date it should have been issued, and as though issued. This may be shown by evidence of the net worth of the assets or by evidence of the net profit [citing authorities]. The law does· not require absolute accuracy in arriving at such value, but a reasonable degree of certainty grounded on a definite basis will suffice: Cornelius v. Lytle, 246 Pa. 205, 209; Wilson v. Wernwag, 217 Pa. 82, 94." "Substantial justice is better than exact injustice": Osterling v. Frick et al., Exrs., 284 Pa. 397, 404.

As defendant had the benefit of his fraud from the date of its commission, there is no injustice in requiring him, as the court in banc did, to pay damages for delay equal to what would be simple interest, which from July 1, 1903, to July 1, 1928, amounts to $116,812.50; this added to the principal makes the total amount $194,687.50. The opinion of Mr. Justice KEPHART, in Whitcomb v. Philadelphia, 264 Pa. 277, contains an elaborate discussion on the question of damages for delay in actions ex delicto. Our views, above expressed as to damages, are not in conflict with Virginia v. West Virginia, 238 U. S. 202, as we understand that case.

The decree is modified by reducing the amount thereof from $616,590 to $194,687.50, with interest thereon from July 1, 1928; and, as so modified, is affirmed at the cost of appellant.

DISSENTING OPINION BY MR. JUSTICE SCHAFFER:

My views do not coincide with those of the majority. I will briefly state them. Simpson occupied no relation of trust or confidence with the trustees who held the majority of the stock in the Eddystone Manufacturing Company. He had the right to buy their stock himself or through an intermediary and was not bound to disclose that he was the purchaser. Nothing prevented

him from thus obtaining control of the corporation. The trustees were experienced business men. Through the contract of sale which they made with Simpson's representatives they knew they were liable to lose control of the corporation because the agreement provided that the purchaser might take less than all the stock and pay a penalty. Godfrey by letter recognized this right after Simpson's representative declined to take any more of the stock and did not allege any loss due to a failure to take it all. The plaintiff still holds the stock which Simpson did not take and in no way has tested its value; for anything which appears, it may be worth as much today as it was when the contract of sale was entered into. The only effect of the loss of control of the corporation which the record shows was the election of Simpson instead of Godfrey as President. I am unable to see how this in any way decreased the value of the stock. No case that I know of holds that mere loss of control can found a claim for damages. The business was one which had been founded by Simpson's forbears and always controlled and managed by them. That he should desire to continue the family control was not unnatural. Godfrey was no blood relation of his. He was only an uncle by marriage. In my opinion, no actionable fraud was established. In addition, I think the claim as made is stale and barred by laches. All the transactions took place more than twenty-three years before this proceeding was brought; at any time during this period if plaintiffs had been vigilant they could have unearthed what was done. They knew at all times that Simpson had bought the stock from Hays and could have found out, if they had investigated, what the relation of Hays and Simpson was in the transaction.

I would reverse the decree and dismiss the plaintiffs' bill.

Mr. Justice FRAZER dissented on the measure of damages, Mr. Justice KEPHART on the question of laches.