Greencastle Livestock Market, Inc., v.
Knauff et ux.

334

*Edwin D. Strite* and *Edwin D. Strite, Jr.*, for plaintiff.

*William R. Davison* and *John McD. Sharpe*, for defendants.

The facts appear from the following opinion on preliminary objections, as follows:

WINGERD, P. J., May 25, 1951.—Plaintiff filed a bill in equity alleging that on or about June 24, 1947, defendants and Martin and Snyder, the predecessors in title of plaintiff, entered into an agreement for the sale by defendants to Martin and Snyder of certain real estate and the buildings and equipment located thereon, which was operated by defendants as a live-stock market, that is, the business of buying and selling livestock, as well as the good will of the business; that by the terms of the agreement of sale defendants agreed that neither directly nor indirectly would they conduct a similar business within a radius of 50 miles of the location of the premises conveyed for a period of 25 years; that Martin and Snyder paid to defendants the sum of $60,000 for the property; that at the time of the sale Martin and Snyder were acting for themselves and as agents or trustees of others, all of whom intend to form plaintiff corporation and that the fact of such agency was known to defendants; that Martin and Snyder conveyed the real estate involved by deed to plaintiff on September 2, 1947, and on the

same day orally conveyed and assigned to it all the stock, equipment, business fixtures, rights and good will which they had acquired from defendants; that by a written instrument dated September 15, 1950, Martin and Snyder ratified the conveyance and assignment which had been made orally; that defendants are now engaging in the business of buying and selling cattle, livestock, poultry, etc., on the premises occupied by them adjacent to the real estate, sold to Martin and Snyder, now owned by plaintiff, and have erected barns and pens, which will accommodate cattle, as well as livestock scales, unloading chutes, etc., and praying that an injunction be issued against defendants to enjoin them from engaging in the buying and selling of livestock on their premises; that damages be awarded for their breach of contract and for general relief.

Defendants filed an answer preliminarily objecting to the bill of complaint on five grounds, to wit:

A. The provision restricting competition by defendants, contained in the original agreement of sale by defendants to Martin and Snyder, constitutes an unreasonable restraint of trade.

B. The provision is too indefinite to be enforcible.

C. This provision did not survive the conveyance by defendants as the provision does not appear in the instrument or instruments of conveyance, and there was nothing in the original agreement that such provision should survive the conveyance of the property, and is therefore unenforcible.

D. The provision was not assignable to plaintiff and therefore is not enforcible by it.

E. Plaintiff's bill shows on its face that it is guilty of laches.

We will take up the preliminary objections in order. Whether a restriction not to conduct a similar busi-

ness to the one sold within a radius of 50 miles for a period of 25 years is an unreasonable restraint of trade or not is a question which involves a number of elements. A provision that the vendor of a business will not compete with the vendee for a limited number of years in a limited territory is ordinarily lawful. In fact if the territory is limited and the time unlimited, it is prima facie good.

In Harris Calorific Company v. Marra et al., 345 Pa. 464, 468, it is said:

"We have said that an agreement of this character if limited in space, though unlimited in time, is prima facie good (Sklaroff v. Sklaroff, 263 Pa. 421, 425, 106 A. 793; Holland v. Brown, 304 Pa. 545, 156 A. 168) and that the burden is on him who sets up unreasonableness as the basis of illegality as a defense in a suit to enforce a contract 'to show how and why it is unlawful' (Holland v. Brown, supra, p. 548; Harbison-Walker R. Co. v. Stanton, 227 Pa. 55, 63, 75 A. 988). With the broadening of the avenues of trade and the increase in facilities for transacting business mere extent of area has ceased to be a controlling factor. What would be a reasonable restriction as incident to the sale of a wholesale business might be unreasonable as applied to a country physician selling his practice.

"It is now the rule in this jurisdiction as well as most others that where a contract is limited as to time or space it is not ipso facto against public policy but it is necessary to make further inquiry and determine whether the restriction is reasonable: Monongahela v. Jutte, supra; Henschke v. Moore, 257 Pa. 196, 201, 101 A. 308.

"Restatement, Contracts, §515 states five particulars in which a restraint of trade is generally unreasonable. It is unreasonable 'if it (a) is greater than is required for the protection of the person for whose

benefit the restraint is imposed, or (b) imposes undue hardship upon the person restricted, or (c) tends to create, or has for its purpose to create, a monoply, or to control prices or to limit production artificially, or (d) unreasonably restricts the alienation or use of anything that is a subject of property, or (e) is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of goodwill or other subject of property or to an existing employment or contract of employment'."

As even unlimited time does not, in itself, make an agreement in restraint of trade unreasonable and illegal, a period of 25 years cannot be held unreasonable when there are no facts alleged in the bill which make it so.

Does the bill show on its face that a radius of 25 miles is unreasonable? The inquiry here seems to be whether or not a territory with a radius of 25 miles, under the facts as alleged in the bill is, as stated in A. L. I. Restatement of the Law of Contracts, §515(a), "greater than is required for the protection of the person for whose benefit the restraint is imposed". When we consider the facilities for and the rapidity with which livestock such as cattle, hogs, chickens, etc., are transported, 25 miles does not impress us as an unreasonable distance to protect the vendee from competition by the vendor of a livestock business. The bill indicates that defendants were operating a livestock exchange or auction. It is not at all unreasonable to suppose that such a center for buying and selling livestock, with present transportation facilities, drew trade from points 25 or more miles distant. The allegations in the bill do not show that the extent of the territory involved is unreasonable.

An agreement, which restrains competition made in connection with the sale of a business and which is limited in time and territory, is presumed to be reasonable and the burden is upon the person claiming its un-

reasonableness to show that fact. No facts are yet apparent which show either the limit of time or territory to be unreasonable. It may develop on hearing that the limit of time or territory is, or that both limits are, unreasonable but we have not yet reached that stage of these proceedings.

As to the second objection that the provision is too indefinite, we see no basis for that contention for the contract uses the words "will enter into or conduct any similar business". The contract speaks of the business of buying and selling livestock, and the bill alleges that defendants are buying and selling livestock on an adjoining property. To us there is nothing indefinite about the term "similar business". A vendee seeking protection from competition by the vendor is not in a position to know what refinements may be practiced by a vendor to escape a provision definitely describing the business transferred and it is not reasonably possible to define all variations of a business. The term "similar business" is an entirely reasonable and definite term which can be easily and clearly interpreted.

The next objection of defendants is rather novel. It is entirely true that the provisions in a contract for sale of real estate are ordinarily merged in the deed. In Dintenfass v. Greenberg, 318 Pa. 20, 23, it is said:

"Even as to parties to a contract there is a legal presumption that an agreement of sale is merged in the deed: Dobkin v. Landsberg, 273 Pa. 174; a presumption which is conclusive as to those matters covered by the deed: Crotzer v. Russell, 9 S. & R. 78, 80; Jones v. Wood, 16 Pa. 25, 38; Cronister v. Cronister, 1 W. & S. 442, 444; and this presumption is rebuttable only as to such covenants of the agreement which might be intended to survive it: Caveny v. Curtis, 257 Pa. 575, 581; Lehman v. Paxton, 7 Pa. Superior Ct. 259, 263."

This rule of law certainly is not applicable to a provision to prevent competition contained in an agree-

ment of sale which provides for the transfer of the whole property of a business, both real and personal, including good will. This is apparent from our discussion of the next preliminary objection.

Defendant also contends that the agreement to prevent competition was not assignable as it was merely a personal covenant with the immediate purchaser and, furthermore, if assignable, it was not properly assigned.

These contentions are not sustainable when we realize that a restrictive covenant such as the one involved in the instant case passes with the transfer of the business, which it was intended to protect, as an incident thereto.

The case of Gompers et al. v. Rochester, 56 Pa. 194, involved an agreement by a vendor of a merchandise business with his vendee " 'not to engage in the business of merchandise, either directly or indirectly, for himself, or by contract of any kind with others, or for them, in the town of Marion, or anywhere within a boundary of ten miles, for the period of five years from the 1st day of October 1863, unless by consent of the parties of the second part.' " (195) The business was sold to three partners, then later two of the partners sold out to one. The one then sold to the original vendor and released him from his agreement not to engage in the merchandise business within the restricted area and time stated in the original agreement. The other two partners sued the original vendor for breach of covenant and the court held:

"The fallacy of the position of the plaintiffs in error, [the two former partners] seems to consist in regarding the covenant as attaching, or incident to them personally; whereas, it was alone an incident to property which they had parted with, and the business also. It would not have been binding for want of a consideration, unless as incident to the property sold at the time of the relinquishment covenanted for. . . . As already

said, the covenant, at all events, passed with the business, which it had been its object to protect. . . ."

In Ebert v. Kaufmann, 17 Dist. R. 156, which involved the sale of a mercantile business including the good will in which the vendor agreed "not to engage in the same business within ten years within five miles of present location", and the business was later re-sold by the vendee to another to the same extent and as fully as the same was then vested in him by virtue of the sale made to him by his vendor. The contention was made that the covenant not having been made with the second vendee, the second vendee had no right to enforce it. The court held on pages 157 and 158:

"In Matthews and Adler's Restraint of Trade, (2nd ed., 1907), 125, it is stated that a covenant not to do business forms a valuable part of the good-will of such trade or business, and the benefit of it will pass to a purchaser of that good-will as incidental thereto without special mention, and although the covenant was not expressed to be made with the covenantee and his assigns. . . .

"Our opinion is that such a covenant as here found adheres to the good-will and the right of enforcement will pass to an assignee of the business." See Friedman v. Ulsamer, 8 Dist. R. 217.

Rahn et ux. v. D'Agostino, 67 D. & C. 183, is in accord with the foregoing cases and on pages 186-187 quotes 2 Williston on the Law of Contracts, 1181, §412, as follows:

" 'Where it is possible courts are disposed to hold that a valuable contract right is not only assignable, but is not confined in its scope to the person of the assignee. A contract by one who has sold a business that he will not compete with the purchaser if strictly interpreted does not forbid competition with an assignee of the purchaser, but the seller's promise is interpreted, unless a contrary intention is expressed, as a promise not to compete with the business in question, whether

conducted by the promisee or by one who succeeds to his ownership.' "

The restrictive covenant in the instant case passed as an incident to the property transferred to plaintiff and plaintiff has a right to enforce it.

The last contention of defendants is that plaintiff has been guilty of such laches as to preclude it from obtaining equitable relief. Plaintiff's bill sets forth that defendants "have erected barns, sheds and pens to accommodate at least several hundred heads of livestock on the property adjoining that of the plaintiff, and that the defendants have livestock scales, unloading chutes and many acres of pastureland to accommodate said cattle on the property immediately adjoining that of the plaintiff."

No time is given when these buildings were erected and nothing is averred as to the time when plaintiff knew that the buildings, etc., were to be used for buying and selling cattle in violation of the restrictive covenant except the averments that one of the defendants, Leonard H. Knauff, possessed a livestock dealer's license for the year 1950, issued by the Bureau of Animal Industry, Department of Agriculture, Harrisburg, Pa., and that on May 15, 1950, the same defendant purchased four hogs from Lester Crider. These are the only two dates mentioned and we cannot assume that plaintiff should know immediately upon the beginning or completion of the buildings and equipment, set forth, that they were to be used by defendants in violating the restrictive covenant but, on the other hand, plaintiff had a right to assume that defendants did not intend to breach the restrictive covenant. The buildings and equipment might have been erected and acquired for many different purposes and plaintiff had a right to assume that defendants were acting in good faith and did not intend to breach the restrictive covenant.

The bill in the instant case was filed on September 18, 1950.

Cases cited by defendants in support of their position are cases where building restrictions or easements were violated and it was held that if plaintiff knew of the violation and allowed the violator to expend money, in connection with such violation, without objection, his delay was fatal to his right to equitable relief. These cases have no application to the present case, for here defendants had a perfect right to erect any buildings they saw fit upon their land at any location they desired. It is the use of the buildings which is the alleged violation of the restrictive covenant and what they were to be used for could not be ascertained until they were completed and such use thereof actually made.

There is nothing before the court which indicates that there was any unreasonable delay by plaintiff in filing its bill after it knew that the use being made by defendants of the buildings was in violation of the restrictive covenant. Laches may be pleaded and, on hearing the case, facts may develop which support defendants' contention in reference thereto but, as we have indicated, there is nothing which would justify the court in now sustaining the contention of defendants that plaintiff is precluded from equitable relief by reason of its laches.

Now, May 25, 1951, defendants' preliminary objections are dismissed and defendants are required to answer over within 20 days from this date under penalty of having the bill taken pro confesso.

## ADJUDICATION

This proceeding is in equity and the matter is before us on plaintiff's bill, defendants' answer containing new matter, plaintiff's answer to new matter and the testimony taken in support of the specific contentions of the parties.

Plaintiff's bill alleges that defendant, Leonard H. Knauff, for some years had operated a livestock auction business on certain real estate located in Antrim Township, Franklin County, Pa., on land owned by him; that on July 24, 1947, defendant, Knauff and his wife, entered into an agreement with Adin K. Martin and John S. Snyder of Hagerstown, Md., for the sale to them of the property connected with the livestock auction business, then being operated by Knauff which included the land, building, fixtures and good will of the business for the sum of $60,000 which agreement contained the following: ". . . the parties of the first part, in consideration of the purchase money as hereinafter set forth, agreeing that they, nor either of them, will enter into or conduct any similar business, either as owners or employees, within a radius of 50 miles from the location of the premises herein above described within a period of 25 years", and pursuant to this agreement plaintiffs by deed transferred the property referred to therein to Martin and Snyder, who in turn conveyed the real estate to plaintiff corporation, by deed, and the stock, fixtures, good will, etc. orally, and in 1950, prior to filing the bill in equity, confirmed in writing such oral transfer; that defendants who own a farm adjoining the real estate on which the livestock sales, stables, etc., were located and on which the business was conducted are engaged in the business of selling and will continue in the future to buy and sell cattle, livestock, poultry, domestic animals and farm products, "and to conduct a business similar to that of the plaintiff"; that defendants have erected barns, sheds, and pens to accommodate several hundred heads of livestock and defendant, Knauff, possesses a livestock dealer's license for the year 1950, and prays for an injunction to enjoin defendants from dealing in livestock within a radius of

50 miles of the premises sold by them to Martin and Snyder.

Defendant filed preliminary objections alleging that the provision in the agreement was unreasonable and indefinite; that it did not survive the transfer of the property to plaintiff as there was no provision to that effect; that the provision was not assignable and plaintiffs were guilty of laches. The court overruled the preliminary objections and defendants filed an answer containing new matter.

The answer denies that Louise C. Knauff, wife of defendant Knauff, was ever interested in the business of her husband, the other defendant, and alleges that she merely joined in the agreement so as to make the same a valid agreement for the sale of real estate; that defendants are not competing with plaintiff in violation of the agreement. The answer further alleges, under New Matter, facts which are claimed to constitute a waiver, by plaintiff, of any right to enforce the agreement because it consented expressly and impliedly to having defendants, Knauff, continue his business as a livestock dealer; that for the same reason they were estopped from securing equitable relief and also pleads laches.

### Findings of Fact

1. Plaintiff, Greencastle Livestock Market, Inc., is a corporation of the Commonwealth of Pennsylvania, having been incorporated on or about August 19, 1947.

2. Defendants, Leonard H. Knauff and Louise C. Knauff, who is the wife of Leonard H. Knauff, reside in Antrim Township, Franklin County, Pa., on real estate adjoining the property of plaintiff, a short distance east of the Borough of Greencastle, Franklin County, Pa., along U. S. Highway Route 16.

3. The premises now owned by plaintiff, consisting of a tract of about four acres improved with a large

livestock auction barn, frame dwelling house and other buildings, were acquired from defendants by Adin K. Martin and John S. Snyder on or about August 29, 1947, by deed recorded in the deed records of Franklin County, Pa. in deed book, vol. 372, page 163, for a consideration of $60,000, pursuant to a written agreement dated July 24, 1947, between defendants as parties of the first part and Martin and Snyder as parties of the second part. A copy of this agreement is attached to plaintiff's bill as exhibit A.

4. On or about September 2, 1947, Adin K. Martin and John S. Snyder, with their respective wives, conveyed to plaintiff, Greencastle Livestock Market, Inc., by deed recorded in Franklin County, Pa., deed book, vol. 372, page 257, the real estate previously acquired by them from defendants pursuant to the agreement of sale, plaintiff's exhibit A, and plaintiff immediately entered upon the business of conducting a livestock auction or market, whereby acting as agent for the seller or buyer plaintiff sold and bought livestock at public or private sale upon a commission basis and sometimes for plaintiff's own account.

5. Defendant, Leonard H. Knauff, had acquired in the year 1940 the real estate subsequently sold to Messrs. Martin and Snyder, and shortly thereafter erected a building on this real estate where defendant conducted a livestock auction or market, buying and selling cattle and other livestock at public auction and private sale as agent for his customers and charging a commission for these services. This business was known as the Greencastle Livestock Market and defendant, Leonard H. Knauff, continued to operate this business until he sold it to Messrs. Martin and Snyder by the agreement of July 24, 1947, plaintiff's exhibit A. Defendant, Louise C. Knauff, had no financial interest in this business conducted by her husband, the other defendant.

6. On or about April 19, 1943, both defendants acquired by deed recorded in Franklin County, Pa., deed book, vol. 308, page 588, a farm of about 116 acres adjoining the real estate where defendant, Leonard H. Knauff, conducted the livestock market or auction. In the year 1944 a large barn was constructed by Mr. Knauff on the adjoining farm, in addition to the existing barn, which had formerly been a hay shed. At the time of the agreement of July 24, 1947, defendants were residing on this farm adjacent to the real estate where the livestock market or auction was operated by Mr. Knauff and have lived there ever since.

7. By the agreement of July 24, 1947, plaintiff's exhibit A, Mr. and Mrs. Knauff agreed to sell to Messrs. Martin and Snyder "said tract containing approximately 4 acres, being now used for the purpose of conducting a livestock sales business, being improved with a large frame sales stable, small frame dwelling house, garage and other improvements". The agreement further provided, "the sale to include as well the buildings and all fixtures and equipment now used by the parties of the first part in connection with the conduct of the business of buying and selling livestock, and for other kindred uses, as for the good will of said business; the parties of the first part, in consideration of the purchase money as hereinafter set forth, agreeing that they, nor either of them, will enter into or conduct any similar business, either as owners or as employees within a radius of 50 miles from the location of the premises herein above described, within a period of 25 years".

8. Beginning with the year 1939 defendant, Leonard H. Knauff, secured a livestock dealer's license from the Department of Agriculture of the Commonwealth of Pennsylvania and has since that time secured such a license from year to year, and while engaged in operating the livestock auction or market,

he bought and sold livestock for his own account but kept his business as a livestock dealer separate and distinct from the livestock auction business, which he conducted under the name of Greencastle Livestock Market, by using the First National Bank of Greencastle as depository for the auction business, the account being in the name of the Greencastle Livestock Market, and the Citizens' National Bank of Greencastle as despository for his personal account as a livestock dealer, such account being in his name.

9. On or about September 1, 1947 the plaintiff, Greencastle Livestock Market, Inc., commenced its business operations on the premises formerly owned by Mr. Knauff and which he had conveyed to Messrs. Martin and Snyder. During the period from September 1, 1947 until January 20, 1949 the defendant, Leonard H. Knauff, bought from the Greencastle Livestock Market, Inc., both at public auction and at private sale at various times, livestock for which he paid Greencastle Livestock Market, Inc. approximately the sum of $109,000.00. Mr. Knauff settled for these purchases by giving his checks to Greencastle Livestock Market, Inc., drawn on the Citizens' National Bank of Greencastle, Pa. Such checks, beginning November 24, 1947, had Mr. Knauff's name printed on each check with the designation "Dealer in Livestock, Greencastle, Pa.", and such checks were imprinted with the picture of a bull and Mr. Knauff's telephone number.

10. On various occasions between September 29, 1947, and August 9, 1948, defendant, Leonard H. Knauff, sold livestock through the Greencastle Livestock Market, Inc., as agent for him. These transactions amounted to the sum of $15,787.47, and Mr. Knauff paid plaintiff their usual commission and overhead charges and received checks from Green-

castle Livestock Market, Inc., for the balances due him.

11. The incorporators of Greencastle Livestock Market, Inc., were Adin K. Martin, John S. Snyder, J. Snavely Cunningham, W. Walter Cunningham and Bruce F. Spickler. They also became directors of the company and continued as such, except that Mr. Spickler, who was also the secretary of the company, severed his connection with it in February of 1950. Following Mr. Spickler's withdrawal, J. Snavely Cunningham, who had previously been the treasurer, became the secretary and treasurer. Mr. Snyder has at all times been president of the company and Mr. Martin has always served as vice president.

12. On several occasions after Greencastle Livestock Market, Inc., became the owner of the property and business purchased by Messrs. Martin and Snyder from Mr. Knauff, plaintiff corporation, through its officers, who were also directors of the company, had transactions with Mr. Knauff as a livestock dealer by which they bought livestock from him at private sale or sold livestock to him in the same manner. These transactions are set forth in findings of fact 13, 14, 15, and 16.

13. While plaintiff was operating the auction business, Bruce F. Spickler bought a load of hogs, about 20 or 25 Hampshires, and took them to Greencastle on an off day. He took them to Adin K. Martin and John S. Snyder but neither one of them could use these hogs because they were too heavy and he said: "I don't know what to do with them." Mr. Martin said: "Why don't you call Leonard Knauff? He uses those kind of hogs." He went up in the office of the stock yard, phoned Mr. Knauff, who came over and bought the hogs.

14. In February 1948 John S. Snyder called Leonard Knauf one morning asking him whether he had

a bunch of hogs. Knauff told him he had 60 clean hogs and about 10 sows. Snyder said he needed a lot of hogs to go to the city and asked Knauff if he would sell the hogs to him. They reached an agreement and Knauff sold him the hogs.

15. On another occasion Adin K. Martin got Knauff to come over to the auction buildings, stating to him that he had hogs which were too heavy for their men, and offered to sell 40 or 45 hogs to Knauff and Knauff bought them.

16. On or about January 17, 1949, Adin K. Martin came over to Knauff's place and said he had 37 hogs that averaged 229 pounds apiece and asked if Knauff could use them. He took Knauff over to the auction buildings in his car and Knauff bought the hogs at 20 cents a pound, got a Mr. Hartman's truck and hauled them over and put them in his (Knauff's) barn.

17. Three or four weeks after the sale of the auction business, Mr. Knauff bought 42 hogs from a man in Bedford and put them in a pen in the auction barn and the next day sold them to a Mr. Hollinger, who was in the meat packing business. The hogs were weighed at the auction barn and Mr. Knauff asked Mr. Snyder, who was present, what he owed him for it and Snyder said "nothing".

18. On the Monday of the first sale held by plaintiffs at the auction barns, Knauff bought over $8,000 worth of livestock which included a number of fat cattle, more than a farmer would buy to butcher for himself. They were sold by Knauff. Also Knauff bought hogs at other times in quantities up to over 100 head in one day which he sold to Hollinger, who was in the meat packing business.

19. At a meeting at which John S. Snyder and Adin K. Martin were present, held after the sale of the business, the agreement was discussed and Mr. Spickler heard Martin and Snyder say that "they had

an agreement drawn up—that Mr. Knauff could not run an auction business for a period of 25 years within a radius of 50 miles" and they showed it to him.

20. Plaintiff had knowledge of the dealings between Knauff and Hollinger for the matter was discussed at a meeting in the back office at the stock yards and no objection nor any protest made by any of them to Knauff in reference to such dealings.

21. In the summer or early fall of 1949 Mr. Knauff bought from plaintiff, through its vice president, Adin K. Martin, platform scales of a type and size ordinarily used by livestock dealers in weighing cattle and other livestock, and these scales were installed by Mr. Knauff on his farm adjoining plaintiff's property. At or about the same time Mr. Martin went to the adjoining farm owned by defendants and found that Mr. Knauff had been erecting pens for additional cattle, together with a scale pit and a loading platform.

22. Plaintiff, through its officers and directors, has had knowledge continuously since that plaintiff started to operate the livestock market or auction on or about September 1, 1947, that defendant, Leonard H. Knauff, has been engaged in business as a livestock dealer, buying and selling cattle and other livestock privately and through plaintiff's public auctions.

23. Neither of the defendants has conducted a livestock auction since the sale of Mr. Knauff's real estate and auction business to Messrs. Martin and Snyder, and neither has either of them bought or sold livestock upon a commission or fee basis.

24. On or about November 18, 1949, plaintiff, through its counsel, wrote defendants and notified them that plaintiff contended that defendants were violating the restrictive covenant against conducting a similar business as contained in the agreement of sale, plaintiff's exhibit A, and that legal action would ensue if such alleged breach of the written agreement

continued. However, the bill of complaint in this case was not filed until September 18, 1950.

25. Plaintiff waived its right to impeach defendant's (Knauff's) course of dealings, of which complaint is now made, by its acts and transactions during the two years that such acts and transactions of Knauff continued without objection on plaintiff's part.

26. At no time during approximately two years that defendant, Knauff, dealt in the manner of which complaint is now made by plaintiff, did plaintiff object thereto in any way whatsoever.

### Discussion

The issue in this case has come to a point where, in this court's opinion, it is very restricted. The court has definitely held that the restrictive covenant is not unreasonable so far as time and extent of territory are concerned.* It is clear from all the testimony that what was contemplated to be conveyed by defendants to plaintiff's predecessor in title was a livestock auction business together with the land on which it was operated. The restrictive covenant states very definitely that defendants shall not "conduct any similar business, either as owners or employees, within a radius of 50 miles from the location of the premises herein above described within a period of 25 years". The evidence is also clear that the business in which defendant, Knauff, is now engaged and has been since September 1, 1947, the time when possession of the livestock auction business was actually turned over to the predecessors in title of plaintiffs, is the buying and selling livestock for his own account and not as an agent or broker on a commission basis for others. His profit or loss depends on the price paid in relation to the price received from sale. Plaintiff claims that is

---

* See Opinion of this court filed May 25, 1951, in re disposition of defendants' preliminary objections.

a similar business because it involves the buying and selling of livestock. A livestock auction business involves the buying and selling of livestock, although, primarily the sales are made at auction. The operators of the auction put up for public sale stock of others and buy for others for which service they receive a fixed compensation and also act as commission men in the purchase and sale of livestock. Defendants contend that dealing for livestock on their own account is not similar to the auction business as there is no public sale involved and that the transactions are made for themselves and not as agents or in behalf of other persons and that Knauff always kept his personal transactions separate from the auction business when it was conducted by him.

The word "similar" is defined in Webster's New International Dictionary, second edition (1954) as, "nearly corresponding; resembling in many respects; somewhat like; having a general likeness." It is obvious that a very strong argument can be made in support of and against the conclusion that dealing in livestock as a dealer for one's own account is similar to conducting a livestock auction where livestock is bought and sold at public sale and sometimes bought or sold privately by the operators of the auction as agents or brokers for a commission. To this court the word as used in the instant agreement is not entirely clear and definite. It is ambiguous. If there was a clear intention to prevent defendants from buying and selling livestock as dealers, for their own account, the restrictive covenant could very easily have stated that in clear terms by the simple provision that defendants were not to, either directly or indirectly, operate a livestock auction nor buy nor sell livestock as dealers. In such a case, it becomes important to consider the interpretation, put by the parties themselves on the contract, as established by their acts and dealings

while the contract was in force. Although the circumstances under which a contract is made and the verbal declarations of the parties may in some cases be important (McMillin vs. Titus, 222 Pa. 500, 502-503), yet, when a written contract is entered into after a period of negotiation, it does not seem to this court that circumstances and general declarations made before the execution of the contract can be considered in interpreting the contract, especially in the present case, for it is very indefinite as to what the respective parties knew about each other, the purpose of the purchasers in buying and the seller's manner of buying and selling in conducting his business or businesses prior to the execution of the contract. As the contract is not clear but indefinite and ambiguous, the manner in which the parties operated under it for a period of over two years throws strong light upon the true intention and meaning of the written contract.

Plaintiff began operating its livestock auction business on or about September 1, 1947, and from that time until January 20, 1949, defendant, Knauff, bought at public sale and at private sale, at different times from plaintiff, livestock approximately of the value of $109,000. These purchases were settled for, after November 24, 1947, by checks of defendant on which appeared defendant's (Knauff's) name with the designation "Dealer in Livestock, Greencastle, Pa." and having printed thereon a picture of a bull and defendant's (Knauff's) telephone number. Between September 29, 1947, and October 9, 1948, defendant, Knauff, sold livestock through plaintiff, as his agent, of the value of approximately $15,787.47 on which he paid plaintiff the usual commission and overhead charges. It seems obvious that any person purchasing and selling livestock to the extent above stated was operating as a dealer, for such purchases

and sales would not be those ordinarily made by a farmer merely purchasing stock for his farm or selling either excess stock or what he had fed and fattened for sale. In addition, the fact that the checks given plaintiff proclaimed Knauff as a dealer in livestock certainly gave to plaintiff notice in what business defendant, Knauff, was engaged. Further, officers of plaintiff dealt in behalf of plaintiff with defendant, Knauff, as one dealer with another. (See findings of fact 13, 14, 15, and 16.) On the first sale conducted by plaintiff, Knauff bought $8,000 worth of livestock, some of which were fat cattle. Fat cattle are not generally used on the farm but are sold to butchers and Knauff so sold them. Knauff bought as many as 100 head of hogs at a time from plaintiff. Furthermore, in the early fall of 1949 defendant, Knauff, bought, from plaintiff, platform scales of the kind ordinarily used by livestock dealers in weighing cattle and other livestock and about the same time plaintiff found that Knauff was erecting additional pens for cattle, together with a scale pit and loading platform. Sometime later in the same year, plaintiff consulted an attorney and for the first time Knauff was notified that plaintiff complained that he was violating the restrictive covenant in question. No bill in equity was filed until September of the following year.

The evidence is uncontradicted that for a period of over two years plaintiff must have known that Knauff was dealing in livestock. The large purchases and sales made by Knauff at the auction of plaintiff, the direct private sales and purchases made between plaintiff and Knauff at plaintiff's request, when plaintiff desired to get rid of certain livestock on its hands or wanted to purchase livestock for its requirements, together with the definite notice given on the checks used by Knauff in paying for the purchases from plaintiff, all put plaintiff on notice that Knauff was

dealing in livestock. Although plaintiff had this notice for about two years no objection was made but for that time plaintiff dealt with defendant, Knauff, as a livestock dealer and after almost two years of such dealings, plaintiff sold livestock scales to defendant, Knauff, which were equipped with rails or fencing to keep cattle on when weighed. It could hardly be supposed that plaintiff for that length of time would be a party to such dealings if it considered them to be in breach of the contract plaintiff had with defendants. Only when plaintiff thought the dealings of Knauff might adversely affect it did it make any objection and raise the question that Knauff was guilty of breach of his contract. Plaintiff either understood the contract did not prevent Knauff from dealing in livestock as a dealer for his own account or, because Knauff was doing large business with it, waived any right it had against Knauff by reason of the agreement including in its scope dealings in livestock as a principal. The former is strengthened by the declaration of the two officers of plaintiff, who originally entered into the contract as individuals, that they had an agreement that Mr. Knauff could not run an auction business for a period of 25 years within a radius of 50 miles (finding of fact 19).

In Monongahela Street Railway Co. v. Philadelphia Company et al., 350 Pa. 603, 618-19, we find,

"The conclusion reached by the court below is strengthened by the fact that the court's interpretation of the covenant in question is the interpretation the bound parties themselves have given it for more than a score of years. It has been frequently reiterated that unless contrary to the plain meaning of the contract, an interpretation given by the parties themselves will be favored: Baker's Trust Est., 333 Pa. 273, 276, 3 A. 2d 785; Armstrong v. Standard Ice Co., 129 Pa. Superior Ct. 207, 213; Philadelphia v. Phila-

delphia Transportation Co., 345 Pa. 244, 251, 26 A. 2d 909."

In Armstrong v. Standard Ice Co., 129 Pa. Superior Ct., 207, 213, the court held:

"The interpretation given by the parties themselves to the contract as shown by their acts or declarations will ordinarily be adopted by the court: Kendall v. Klapperthal Co., 202 Pa. 596, 609, 52 A. 92; Gillespie v. Iseman, 210 Pa. 1, 5, 59 A. 266; McMillin v. Titus, 222 Pa. 500, 72 A. 240; Tustin v. Phila. & Reading C. & I. Co., 250 Pa. 425, 95 A. 595."

See also Baker's Trust Estate, 333 Pa. 273, 276-77; McMillin v. Titus, 222 Pa. 500, 503; Citizens Trust Company et al., v. Metzger, 76 D. & C. 421, 430.

In this court's opinion the dealings and actions of the parties indicate they interpreted the word "similar" as not including the business of dealing in livestock as a dealer or principal but that it included only conducting a livestock auction or acting as agent or broker for others for a commission and, therefore, the court will follow such interpretation. Under this interpretation there is no ground for equitable relief and the bill must be dismissed.

If we consider the contract clear and definite and of such a character that the dealings in livestock in which Knauff has and is engaged are a breach thereof, nevertheless plaintiff is not entitled to the relief prayed for. The evidence to which we have referred shows not only a clear acquiescence by plaintiff in Knauff's breach over a long time but a joining in such breach for its own benefit. It was a party to transactions with Knauff which it now claims were breaches of contract. Knauff after his dealings had been acquiesced in for a long period built pens, a loading platform and bought scales from plaintiff. The conclusion is easily reached that if plaintiff had made timely objection to Knauff's transactions, of which

complaint is now made, he would not have made the improvements he did, including the purchase of scales from plaintiff and the installation thereof. The transactions of plaintiff with Knauff as a dealer in livestock are sufficient affirmative act to raise the inference that it intended to waive its right to assert that transactions of Knauff as a dealer in livestock for his own account as principal were breaches of the contract in question and are sufficient to constitute an estoppel.

In Shoemaker's Account, 277 Pa. 424, 429-30, it is said:

" 'Where a person, with actual or constructive knowledge of the facts, induces another by his words or conduct to believe that he acquieces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. And this is so regardless of the particular intent of the party whose acquiescence induces action': 21 C. J. 1216. 'But it seems that the acquiescence need not involve anything in the nature of a positive affirmation, as the rule is well recognized that when a party, with full knowledge, or with sufficient notice or means of knowledge, of his rights and all the material facts, remains inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable': 10 R. C. L. 694. If one, knowing his rights, sees the other acting on a mistaken notion as to his, an estoppel may arise: P. & R. C. & I. Co. v. Schmidt, 254 Pa. 351; Lancaster v. Flowers, 208 Pa. 199, and authorities there cited."

In Kahn v. Bancamerica-Blair Corporation, 327 Pa. 209, 214-15, we find:

"To constitute a waiver there must be some affirmative act on the part of the party affected showing that he so intended or acts amounting to an estoppel on his part: Emmons v. McCreery, 307 Pa. 62, 160 A. 722; Dougherty v. Thomas, 313 Pa. 287, 169 A. 219."

See also Priester v. Milleman, 161 Pa. Superior Ct. 507, 517-18; Dougherty, Trustee, et al., v. Thomas, Executor, 313 Pa. 287, 297.

It is rather difficult to separate or distinguish waiver, acquiescence, estoppel, and laches one from another, all seem to overlap and all seem based on the theory of estoppel except an express waiver. Even in respect to laches, "References are found in the reports to 'the doctrine of estoppel by laches' and to the fact that by reason of laches a complainant is 'barred and estopped' from maintaining a suit,": 19 Am. Jur. 341, Equity, §493. Acquiescence and implied waiver also seem important in laches.

In Soifer et ux. v. Stein et ux., 101 Pa. Superior Ct., 135, 141 it is said:

"Laches or acquiescence do not depend on time alone, but on diligence in ascertaining rights and asserting them; indifference may become acquiescence: McGrann v. Allen, 291 Pa. 574, 578; Fidelity Phila. Tr. Co. v. Simpson, 293 Pa. 577, 585."

In Hansell v. Downing, 17 Pa. Superior Ct. 235, 239-40, we find:

"In order to justify a holding that the plaintiff has lost, through laches, a right founded in express contract, it must appear that she has been guilty of some omission which would warrant the presumption that she had abandoned her claim and declined to assert her right. Laches is not to be imputed to a party from the mere lapse of time alone; it is an implied waiver, arising from knowledge of existing conditions and an ac-

quiescence in them. The question is one involving equitable principles and is determinable from the particular facts in each case."

The evidence in the present case, as can be seen from the above cited authorities, is sufficient to bar plaintiffs from any relief by reason of defendant's (Knauff's) dealing in livestock on his own account, even though such dealing was a breach of the contract in question. Whether we base this bar on implied waiver and estoppel or upon laches is not too important for the elements of both are present. Knowledge of the breach, joining in the breach by plaintiff and so causing defendant, Knauff, to proceed without objection was such acquiescence as to be an implied waiver for it constituted an estoppel. Acquiescence for two years with full knowledge of and joinder in transactions, now contended to be breaches of the contract, without objection and delay of about three years before bringing suit is laches. Either is sufficient to bar recovery and justify dismissal of the bill.

### Conclusions of Law

1. The restrictive covenant in question is indefinite and ambiguous.

2. The actions of the parties indicate that they interpretated the restrictive covenant in question in such a way that under it defendant, Knauff, had the right to deal in livestock as a principal for his own account, and the restrictive covenant shall be so interpretated.

3. Whatever right plaintiff had under the restrictive covenant in question to impeach the action of defendant, Knauff, in dealing in livestock as a principal for his own account, was waived by plaintiff.

4. Plaintiff is guilty of such laches as to bar its present action in equity against defendants.

## Decree Nisi

Now, April 2, 1954, it is hereby ordered, adjudged and decreed that the prayer of plaintiff's bill is refused and plaintiff's bill is dismissed. The prothonotary is directed to enter this decree nisi and notify the parties of this adjudication, or their counsel, forthwith. If no exceptions are filed within 20 days, after the notice of the filing of this adjudication, a decree shall be entered. The cost of this proceeding shall be paid by plaintiff.

OPINION AND DECREE SUR EXCEPTIONS TO ADJUDICATION

WINGERD, P. J., January 7, 1955.—Exceptions were filed to the court's findings of fact and conclusions of law and to its failure to adopt certain findings of fact suggested by plaintiff.

We shall take up the exceptions in order.

The first exception is the failure to adopt suggested finding of fact no. 17. This has no merit as there is no evidence to support the suggested finding of fact and the court refuses to so find.

The second, third and fourth exceptions are to the failure to adopt plaintiff's suggested findings of fact nos. 18, 19 and 20. The matters contained in them are covered by the court's findings of fact nos. 8 and 22 and the court refuses to make such suggested findings.

The fifth, sixth and seventh exceptions are to the failure of the court to adopt plaintiff's 21, 22 and 23 suggested findings of fact. These findings which relate to alleged loss of customers, alleged damages suffered and inadequacy of remedy at law, are not material or relevant in view of the court's findings of fact and conclusions of law, the reasons for which appear in the court's discussion. The court refuses to make such suggested findings.

The eighth, eleventh, twelfth, thirteenth and fourteenth exceptions are to the court's failure to find that an injunction should issue and to the conclusions of law of the court which are the basis of the court's refusal of the prayer of the bill. The court's position in reference thereto is fully set forth in the court's discussion.

The ninth and tenth exceptions are to findings of fact nos. 25 and 26 made by the court. The findings have to do with waiver and failure to object to defendants' course of dealing and are fully explained in the court's discussion.

The fifteenth exception is to the court's decree nisi.

Plaintiff contends that the court's interpretation of the contract has been inconsistent, in that, in its opinion overruling defendants' preliminary objections that the contract was so indefinite as to be unenforcible the court held the use of the word "similar" was sufficiently definite for "A vendee seeking protection from competition by the vendor is not in a position to know what refinements may be practiced by a vendor to escape a provision definitely describing the business transferred and it is not reasonably possible to define all variations of a business. The term 'similar business' is an entirely reasonable and definite term which can be easily and clearly interpreted." The term "similar" indicates clearly what the contract means but is a relative term and subject to interpretation as to its application to a particular set of facts. Whether one business is similar to another can often be the subject of difference of opinion. Under the facts of the instant case there can be an honest difference of opinion as to whether the auction and commission business is similar to dealing for one's own account and this makes the contract dubious as to the particular facts arising in the present controversy. In such a case the action of the parties showing their interpretation is a

guide to the court and will be ordinarily adopted by it. Armstrong v. Standard Ice Co., 129 Pa. Superior Ct. 207, 213. There is a vast difference between a contract which is too indefinite on its face to be recognized as a valid, enforcible contract and a contract which is subject to interpretation as to its application to a particular set of facts. We see nothing inconsistent in the court's treatment of the instant contract in reference to the preliminary objections and to its interpretation under definite proven facts.

Plaintiff further argues that there was no waiver or laches because during about two years following the sale defendant's dealing in livestock for his own account did not injure plaintiff as quite a bit was done with it. In fact there is no definite evidence of damage either after or during the two year period referred to by plaintiff. However, defendant's manner of dealing in livestock was the same during those two years as it was later and if his course of dealing was a breach of contract it was just as much a breach during the first two years following the sale as it was later. We cannot see how a party to a contract can waive a breach when it thinks such breach inures to its benefit and revoke the waiver when it thinks it is being harmed. A waiver once complete is irrevocable even when there is no consideration for it and the party in whose favor it is made has not changed his position: 56 Am. Jur. §126. A party cannot blow hot and cold as it sees fit and treat an action as not a breach of contract one time and then claim it to be a breach at another, just as its inclination dictates. When it once asquiesces in certain actions and becomes a party to them and makes no objection to them, it is not in a position to claim they are a breach of contract for it has waived its right to claim the same actions a breach of contract when they are repeated. Waiver and laches

as applied to present case are fully considered in the court's "discussion".

Now, January 7, 1955, the exceptions are overruled and the decree nisi is hereby made final.

